Sherman GRANT *v.* STATE of Arkansas

CR 79-156                                        589 S.W. 2d 11

Opinion delivered November 5, 1979
(In Banc)

*John W. Achor,* Public Defender, by: *James Phillips,* Deputy Public Defender, for appellant.

*Steve Clark,* Atty. Gen., by: *Ray Hartenstein,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Sherman Grant was found guilty of murder in the first degree and sentenced to a term of 40 years' imprisonment. His appeal raises only one ground for reversal, even though it is stated in two points. Basically, his contention is that the trial court erred in denying his motion to suppress incriminating evidence discovered and seized by a police officer in a bedroom he occupied in the home of his foster parents, Rufus Cyrus, Sr. and Dorothy Cyrus. The ground on which the motion was based was that the warrantless search of the room was unreasonable because the written consent given by Rufus Cyrus, Sr., was invalid for two reasons — first, because he had no authority to consent to a search of Grant's room, and second, because his consent was not voluntarily given. Since we find no basis for overturning the finding of the trial court denying the motion to suppress, we affirm.

Detective David Garner, as a member of the homicide and robbery division of the Little Rock Police Department, was assigned on February 13, 1978, to investigate a homicide at 7408 Preston Drive in Southwest Little Rock. He arrived at the scene at 12:40 a.m. and obtained information that caused him to go to the Cyrus residence at 2201 South Battery Street in Little Rock. When he arrived there he found Detective Quattlebaum and Patrol Officers Middleton and Williams. Garner said that two of them were on the second floor of the residence where Grant's room was located, standing with Grant, awaiting Garner's arrival. They conducted no search. On the basis of the information he had obtained, Garner took Grant into custody and conveyed him to the Little Rock Police Department. The other officers remained at the Cyrus residence.

Because he wanted to obtain the advice of the prosecuting attorney as to further procedure, Garner made no attempt to conduct a search at the Cyrus residence. While at

police headquarters, he called the prosecuting attorney and asked whether he should try to get a search warrant or to obtain consent of the father to the search. Based upon the advice he was given, Garner returned to the Cyrus dwelling without attempting to obtain a search warrant. The search was conducted after Cyrus had executed a form bearing the title, ''Consent to Search,'' by which he gave his consent to the search.

When completed, the document bore the signature of Rufus Cyrus, Sr., and Detective D. Garner and Officer S.M. Williams signed their names as witnesses. Otherwise, the document read as follows:

2-13-78
(Date)

2201 S. BATTERY
(Location)

I, *RUFUS CYRUS SR.,* having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize officer DET. D. GARNER, _____ , *OFFICER S. WILLIAMS* of the Little Rock Police Department to conduct a complete search of my premises/auto located at *2201 S. BATTERY.* These Officers are authorized by me to take from my premises/auto any letters, papers, materials or other property which they may desire.

This written permission is being given by me to the above-named officers voluntarily and without threats or promises of any kind.

(The portions which are capitalized were handwritten into blanks in the form.)

After this form was executed, the officers went into the room which had been occupied by Grant and found a .45 caliber Colt automatic pistol, two clips of .45 caliber bullets,

one containing five rounds and the other seven, 31 rounds of .45 caliber ammunition in a box and eight rounds of .32 caliber ammunition.

We do not agree with appellant's argument that only he could give consent to a search of the room. We held in *Asher* v. *City of Little Rock,* 248 Ark. 96, 449 S. W. 2d 933 that one having joint possession or equal authority with another over the premises may authorize a warrantless search. The only argument advanced by appellant is that *Asher* is distinguishable because, even though Grant paid Cyrus no rent for the room, he paid board and everything in the room belonged to Grant. We do not think these distinctions are sufficient to show that the consent given by Cyrus was invalid. Under Rule 11.2 (c), Arkansas Rules of Criminal Procedure, consent justifying a search and seizure, in the case of a search of premises, may be given by a person who, by ownership or otherwise, is apparently entitled to give or withhold consent. Garner testified that the two-story building appeared to be a one-family house and that he was told by Cyrus that it was Cyrus's house. Officer Susan Williams testified that Garner was told that Grant was the foster son of Cyrus by Cyrus himself. Cyrus testified that the house was his. He said that Grant had lived with him since Grant was five years old, except for a one-year period during which he was employed by United Parcels. Mrs. Cyrus also testified that she washed Grant's clothes and sometimes put them in the dresser drawer in his room.

The search based on a voluntary consent by Cyrus would be valid under Rule 11.2, which validates consent by any person who, based upon circumstances as they appear to the officer conducting the search, is apparently entitled to give or withhold consent. Although this rule relieves the searching officer of any criminal or civil liability, it does not, standing alone, govern admissibility of things seized during the search. See Commentary to Article IV, Arkansas Rules of Criminal Procedure. The standards for suppression of evidence are set out in Rule 16.2. In Comment I to this rule, it is pointed out that a motion to suppress may be based upon the fact that consent was not given by any person authorized to give consent. The Limitation on Rule 11.2, however, does not mean that the appearance of authority to give consent is

not an important factor in determining validity of consent to search, if the searching officers could reasonably believe in good faith that the one giving consent had authority to do so. *United States* v. *Peterson,* 524 F. 2d 167 (4 Cir., 1975); cert. den. 423 U.S. 1088, 96 S. Ct. 881, 47 L. Ed. 2d 99; *United States* v. *Sells,* 496 F. 2d 912 (7 Cir., 1974).

The question here is whether the search was in violation of the Fourth Amendment to the United States Constitution. That amendment only prohibits, and the exclusionary rule only applies to, unreasonable searches. *Norris* v. *State,* 259 Ark. 755, 536 S.W. 2d 298.

We cannot find any basis for reversing the trial court's holding that the consent was authorized. We held in *King* v. *State,* 262 Ark. 342, 557 S.W. 2d 386, that the mother-in-law of an accused had the authority, as owner and co-occupant of the premises, to consent to a warrantless search of her premises. In *Robinson* v. *State,* 256 Ark. 675, 509 S.W. 2d 808, we quoted *Asher* to the effect that there can be no doubt that an occupant who has a proprietary interest in a building can consent to entry by police officers, a search of the premises and seizure of evidentiary material found there. See also, *Giles* v. *State,* 261 Ark. 413, 549 S.W. 2d 479, cert. den. 434 U.S. 894, 98 S. Ct. 272, 54 L. Ed. 2d 180.

The validity of the consent under the Fourth Amendment standards, however, cannot rest upon the ownership of the premises. *United States* v. *Matlock,* 415 U.S. 164, 94 S. Ct. 988, 39 L.Ed. 2d 242 (1974). Instead, it rests upon mutual use of the property by persons generally having joint access or control for most purposes. The pertinent question is whether the one giving consent possesses common authority or other sufficient relationship to the premises.

There could be little doubt under our earlier decisions about the authority of Cyrus to consent to this search. See *Maxwell* v. *State,* 236 Ark. 694, 370 S.W. 2d 113. Our decisions were in accord with pre-*Matlock* decisions in other jurisdictions. A child, either dependent or emancipated (having reached his majority) does not have the same constitutional right or expectation of privacy in the family home that

he might have in a rented hotel room, and the rights of the father were held to be superior to those of the child, so that the father's consent to a search of the child's room was sufficient to render a warrantless search reasonable. *State* v. *Kinderman,* 271 Minn. 405, 136 N.W. 2d 577 (1965), cert. den. 384 U.S. 909, 86 S. Ct. 1349, 16 L.Ed. 2d 361. See also, *People* v. *Wood,* 31 N.Y. 2d 975, 293 N.E. 2d 559 (1973); *United States* v. *DiPrima,* 472 F. 2d 550 (1 Cir., 1973); *United States* v. *La Vallee,* 417 F. 2d 523 (2 Cir., 1969), cert. den. 397 U.S. 1002, 90 S. Ct. 1150, 25 L.Ed. 2d 413; *United States* v. *Stone,* 401 F. 2d 32 (7 Cir., 1968); *Vandenberg* v. *Superior Court,* 8 Cal. App. 3d 1048, 87 Cal. Rptr. 876 (1970).

In this family situation we think the constitutional standards are met, as they were in *King,* a post-*Matlock* case. Quite a number of jurisdictions have adhered to basic pre-*Matlock* principles in a family situation, such as we have here. In *People* v. *Johnson,* 23 Ill. App. 3d 886, 321 N.E. 2d 38 (1974), it was held that a mother's consent to a search of the room of a son, who was married but living in a house owned by his father and mother and not with his wife, was sufficient basis for a warrantless search. The consent of a mother who was head of the family to a search of her son's room in a family home jointly owned by the mother and son was held valid by *Matlock* standards in *State* v. *Forbes,* 310 So. 2d 569 (La., 1975).

Since it is clear that Cyrus, in addition to being the owner of the premises which constituted and were maintained as a single family dwelling, was the head of the single family household and had not surrendered or relinquished exclusive control of the Grant bedroom or the ability to designate what use could be made of it, by lease or otherwise, he maintained the right to access and control over the entire premises, and had authority to consent to a search of the bedroom. See *United States* v. *Peterson,* 524 F. 2d 167 (4 Cir., 1975), cert. den. 423 U.S. 1088, 96 S. Ct. 881, 47 L. Ed. 2d 99, in which the court found reinforcement in *Matlock.* See also, *Maxwell* v. *Stephens,* 348 F. 2d 325 (8 Cir., 1965), cert. den. 382 U.S. 944, 86 S. Ct. 387, 15 L. Ed. 2d 353, reh. den. 382 U.S. 1000, 86 S. Ct. 532, 15 L. Ed. 2d 490, which the

Fourth Circuit Court of Appeals found particularly persuasive in arriving at its result in *Peterson*. It is not contended that the fact that Grant was a foster son makes any difference — and it doesn't. In any such situation, the status of one in loco parentis and a natural parent should be the same.

Viewing the totality of the circumstances, we cannot say that the trial court erred in holding that Cyrus had authority to consent to the search.

This brings us to the question of voluntariness of the consent given. Appellant argues that, when we view the totality of the circumstances, we cannot find that the state has met its burden of proving by clear and positive testimony that consent had been freely and voluntarily given. The alleged circumstances are: (1) the lack of limitation in the form of the scope of the search as to time, area or items to be seized; (2) the failure of the consent form to advise Cyrus that his consent could be withdrawn or limited at any time prior to completion of the search; (3) several police officers were present, some of whom carried weapons; (4) the request for consent was made at 3:30 a.m., a short time after the foster son had been taken to jail after having been arrested without a warrant; (5) the police had drawn their weapons in making the arrest; (6) when arrested, appellant insisted that his room could not be searched without a warrant, and Detective Garner said that he would get a warrant; (7) Garner returned and produced a paper which at "the head of it said 'warrant,' " which he asked Mrs. Cyrus to sign; (8) after she and Cyrus both refused to sign this paper, Garner said, "Well, I'll get a warrant to search the whole house;" (9) the piece of paper exhibited was not the one Cyrus signed; (10) Cyrus was frightened when he signed the paper; (11) neither Mr. or Mrs. Cyrus had any comprehension of what they were signing; and (12) it would have been easy to have obtained a search warrant.

Even though, in reviewing a trial judge's ruling on a motion to suppress evidence, we make an independent determination based upon the totality of the circumstances, we will not set aside the trial judge's finding unless we find it to be clearly against the preponderance of the evidence. *State*

v. *Osborn,* 263 Ark. 554, 566 S.W. 2d 139; *Mc Guire* v. *State,* 265 Ark. 621, 580 S.W. 2d 198. In our determination, considerable weight is given to the findings of the trial judge in the resolution of evidentiary conflicts. *State* v. *Osborn,* supra. We must, of course, defer to the superior position of the trial judge to pass upon the credibility of witnesses. *State* v. *Osborn,* supra; *Whitmore* v. *State,* 265 Ark. 419, 565 S.W. 2d 133.

When we view the conflicts in the evidence and defer to the trial court's superior position in determining questions of credibility, many of the circumstances relied upon by appellant to constitute the totality must be disregarded. Detective Garner testified that none of the officers had drawn his weapon at the time of the arrest and that no guns were drawn at any time while Garner was at the Cyrus house. Officer Susan Williams did not believe that any of the officers who first entered the Cyrus residence drew a weapon at the time they entered and said that, to her knowledge, no weapons were drawn at any time. Rufus Cyrus testified that the officers did not have their guns drawn when they came in the house.

Detective Garner could not recall Grant's having told him that he would have to have a search warrant before he could search the house. Garner said that there had been no conversation whatsoever between him and Grant about a search of the house. Officer Susan Williams did not hear Grant make such a statement. Only the Cyruses testified that they heard this alleged statement. Grant did not testify at the suppression hearing.

Garner testified that he read the "Consent to Search" form that was introduced in evidence to Cyrus and that Cyrus signed that form. Officer Williams testified that she saw Cyrus sign the form that was introduced and that she signed it as a witness. The testimony of Cyrus and his wife that the paper Garner brought back with him after Grant's arrest was headed with the word "Warrant," and not "Consent to Search," and that the piece of paper Cyrus signed was shorter than that introduced, probably was not very convincing. Even though Cyrus insisted that he had signed a

piece of paper different from the form introduced, he admitted that he had given the officers permission to search Sherman's room. He admitted that much of the content of the paper he signed was the same as part of that of the form introduced. He also verified his signature on the form introduced, but claimed that the exhibit was a photostatic copy. The writing in the blanks and the signatures on the exhibit obviously are not photostatically copied.

There is no evidence of any general search of the entire house. Mrs. Cyrus said that the officers searched the kitchen and Grant's room. Garner testified that when he returned from the police department he told Cyrus that he wanted to search for a weapon. There is no indication that there was any search for anything except weapons and ammunition. Garner said that he read the form introduced to Cyrus and that Cyrus signed it. The testimony of Susan Williams corroborated that of Garner.

A statement that Cyrus could withdraw his consent or limit the search as provided by Rule 11.5, Arkansas Rules of Criminal Procedure, was certainly not required, and the failure of the officers to so advise Cyrus did not invalidate the consent. *Pace* v. *State*, 265 Ark. 712, 580 S.W. 2d 689. It would be illogical to require this advice, since there is no requirement that advice that consent may be withheld be given. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

This case is quite unlike *Moore* v. *State*, 261 Ark. 274, 551 S.W. 2d 185. The consent by the parents in *Moore* was oral, if given at all. There two police cars containing four officers surrounded the parents' home. Two officers entered the front door. At least one of them had drawn a weapon at the time of entry. There was evidence that the conduct of the officers was different here. Not only was there evidence that none of the officers drew a weapon while in the Cyrus house or when entering it, Detective Garner had first called the Cyrus house by telephone and advised Cyrus that Grant had been involved in a shooting and that police officers would be coming to the house. When Garner said that he would like to talk to Grant, Cyrus invited Garner to "come on." When

the officers came, they asked permission to enter. The officers who first arrived waited until Garner came before undertaking any action, except to prevent Grant's escape. No attempt was made to conduct any search at the time of the arrest or even while Garner was away, although two officers remained at the Cyrus residence. Only after Garner's return was there any discussion of a search. It is interesting to note that State's Exhibit 9 was a sales receipt to Grant for the weapon involved which was found by Mrs. Cyrus in a wastebasket near Grant's bedroom door at 8:00 a.m., long after the police had left.

In attempting to show that Cyrus was frightened by the presence of the officers, Rufus Cyrus testified that six policemen and four detectives were present, and that six policemen were in uniform and two dressed in civilian clothes. Mrs. Cyrus said that at least five detectives came into the house. Their efforts to describe the numerous officers were not convincing. There is no reason to believe that more than the four officers mentioned by Garner and Williams were present. According to Mr. Cyrus, only Officer Williams and one other officer remained in the house during the period of approximately one hour while Garner was away. He said they simply sat down in his den and talked during this period. We cannot help recognizing that there are practical difficulties in obtaining a search warrant at 2:30 a.m.

When we give regard to the trial court's resolution of conflicts in the evidence and of credibility, appellant's chain of circumstances is broken into fragments. We cannot say that the holding of the trial court was clearly against the preponderance of the evidence, so the judgment is

Affirmed.

HARRIS, C.J., not participating.