Tammy LOVE *v.* STATE of Arkansas

CR 03-153                                    138 S.W.3d 676

Supreme Court of Arkansas
Opinion delivered December 11, 2003

*Jason W. Massey*, Public Defender, for appellant.

*Mike Beebe*, Att'y Gen., by: *Linda Blackburn*, Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant, Tammy Love, appeals from her judgment of conviction for manufacturing a controlled substance, possession of drug paraphernalia, and terroristic threatening. She was sentenced, following a jury trial, to twenty years' imprisonment. She raises one point on appeal. She contends that the circuit court erred in denying her motion to suppress evidence, when police officers only obtained consent from her co-tenant who was not authorized to give consent to search her bedroom. We disagree with Love and affirm the judgment of conviction.

The facts in this case are taken from testimony given at Love's suppression hearing. On December 2, 2001, Love's roommate and co-tenant, Curtis Timmons, told the Booneville Police Department that Love and a friend had been processing methamphetamine at the Timmons/Love residence.[1] Although Timmons and Love shared the home, each had separate bedrooms. Following Timmons's statement to the Police Department, police officers and sheriff's deputies went to the residence to arrest Love pursuant to an outstanding arrest warrant. Officer Dudley Crossland of the Booneville Police Department testified that upon arriving at the residence, he and Deputy Russell Stilwell of the Logan County Sheriff's Department informed Love, who answered the door, that they had a warrant for her arrest. Officer Crossland testified that she told him she had something on the stove, at which time he followed her from the doorway to the kitchen of the residence, where she turned the stove off. Officer Crossland and Love returned to the front porch where Love was arrested. Following her arrest after returning outside, Officer Crossland inquired as to whether there was anyone else in the home. She advised that Jamie

---

[1] Timmons's statement names Love's friend as Jamie Everett. However, the record reveals the friend's actual name was Jamie Emberson. Emberson was also a co-defendant of Love's.

Emberson, Love's co-defendant, was there, and he came out of the southwest bedroom, which was Love's bedroom. Emberson sat on the front porch but was not arrested at that time.

Following Love's arrest on the front porch, Officer Crossland asked her permission to search the home. Love refused. When Love refused, he asked Timmons for permission to search the home. Timmons had returned to the house for that purpose, and he gave his consent. Deputy Stilwell stayed outside with Love and Emberson.

After the consent was given by Timmons, Officer Crossland, Detective Steve Reid of the Booneville Police Department, then-Deputy Albert Brown of the Logan County Sheriff's Department, and Deputy Tom Delay of the Logan County Sheriff's Department entered the house to begin the search. Detective Reid testified that he was directed by Officer Crossland to go into the bedroom off the living room. In that room, he testified that they found "different chemicals such as Heet, . . . peroxide, hoses, filters, [and] some unknown liquid substances also." Deputy Tom Delay testified that upon being notified by another police officer that he had "found something," he "looked in at the bed." He saw what appeared to be drug paraphernalia and items used for the production of drugs laid out on the foot of the bed.

On recall, Officer Crossland testified that after searching the kitchen and dining area of the Timmons/Love residence, he found a can of lighter fluid and lye. He stated that either Deputy Delay or Deputy Brown indicated that they had found some things in the southwest bedroom. Upon entering the bedroom, Officer Crossland saw "tubing, duct tape, . . . a big bowl of still unknown liquid, . . . handmade filters, all kinds of jars, . . . some diaper bags or bags . . . [which] contained a plastic bag containing a white powdery substance. . . . [and] a brown liquid substance . . . , . . . paper filters, rubbing alcohol[,] . . . [and] homemade funnels." Officer Crossland testified that it was possible to see some of the items on the bed from outside the bedroom.

Deputy Brown testified that when "somebody hollered," he went to the southwest bedroom. He stated that he could see through the doorway to the room that there were needles and "some different stuff" laying on the bed, as well as a duffel bag full of various items at the foot of the bed. Through the doorway, Deputy Brown testified that he could see a "big glass jar with a clear liquid substance" on the dresser, which was in plain view. He

further testified that the door to the southwest bedroom was open when he walked into the house with Officer Crossland, Detective Reid, and Deputy Delay.

Love also testified at the suppression hearing. She stated that on that day, she got out of bed, got dressed, and closed the door of her bedroom before answering the door. She said that she closed the door of the bedroom, because she had children and had things in the bedroom which she did not want them to touch. She stated that Emberson was already up and in the kitchen cooking. She accused Officer Crossland of lying when he said that he followed her into the kitchen to turn off the stove. She said that when the police arrived, she was in bed, and Emberson was in the kitchen cooking. She also stated that she told the police officers that her three children were not there.

Emberson testified that after getting out of bed, he went into the kitchen to cook macaroni. He said that Love answered the door when the police officers came, and that she stepped back into the house to tell him that she was going to jail. He also testified that Love shut the door to the bedroom when she went to answer the front door and that there was nothing on the bed when he left the bedroom. He stated that while Love had multiple jars in the bedroom, he had not seen a bag of white powder or a milk jug containing a brown substance in the room. Additionally, he said that Love would have tubing, because her children were on a breathing machine.

After the hearing, the circuit court denied the motion to suppress:

> . . . I'm going to deny the motion to suppress and I'm going to do it on this basis.
>
> Number one, I think law enforcement acted reasonable under the circumstances. I don't even know that they needed to get the consent to search. I think when they placed her under arrest they had a right to secure the premises. They had a right to go into the home and specifically go into her home. They had a right and I would say they had a duty to go into that home and make sure there were no young people in that home that were in danger. And I guarantee you that if something bad had happened and there were children in that home and they'd gotten injured they would of heard

about it later. They had a duty to go in and make sure that home was secure and that is reasonable conduct.

Now they had a — arguably had a right to do it based on the arrest warrant, but that's not the basis by which they were operating. But they went ahead and went a further step and obtained the consent to search from the co-tenant and for that reason I find the conduct was reasonable and the motion to suppress would be denied.

Following the denial of Love's motion to suppress, a jury trial was held. Neither party to this appeal abstracted the testimony' at trial regarding the fact that in order for Timmons to gain access to his bedroom, he had to go through Love's bedroom or the fact that he and Love shared a common bathroom between the two bedrooms. Thus, we will not consider that testimony for purposes of this appeal.

After the trial, the jury found Love guilty of terroristic threatening in the first degree, manufacture of a controlled substance (methamphetamine) and possession of drug paraphernalia. The circuit court sentenced Love to prison for a term already set out in this opinion.

For her sole point on appeal, Love argues that the evidence seized from her bedroom should be suppressed, because it was obtained as the result of an illegal search. She contends that a co-tenant can only consent to a search of common areas and his private area. Thus, she claims that police officers did not have consent to search her private bedroom. She further maintains that because the police arrested her in the doorway of her home, the search cannot be validated as one incident to arrest. She discounts the notion that police officers were attempting to secure the premises for fear that any children present in the home might be harmed by a potential methamphetamine lab as a basis for the search. She asserts that none of the police officers testified at the suppression hearing about any concern they had for children present in the home.

This court recently set forth our standard of review for a denial of a motion to suppress evidence obtained by a warrantless search:

. . . Our standard of review for a trial court's action granting or denying motions to suppress evidence obtained by a warrantless search requires that we make an independent determination based upon the totality of the circumstances, giving respectful consideration to the findings of the trial judge. *State v. Osborn*, 263 Ark. 554, 566 S.W.2d 139 (1978). In *Osborn*, we stated:

> [W]e have given considerable weight to the findings of the trial judge in the resolution of evidentiary conflicts. [*Harris v. State*, 244 Ark. 314, 425 S.W.2d 293 (1968).] We must defer to the superior position of the trial judge to pass upon the credibility of witnesses. *Whitmore v. State*, 263 Ark. 419, 565 S.W.2d 733 [133] (1978).

*Osborn, supra.*

*Davis v. State*, 351 Ark. 406, 411, 94 S.W.3d 892, 894-95 (2003).

■ We have said that a warrantless entry into a private residence is presumptively unreasonable under the Fourth Amendment. *See Latta v. State*, 350 Ark. 488, 88 S.W.3d 833 (2002); *Welsh v. Wisconsin*, 466 U.S. 740 (1984). That presumption may be overcome, however, if the police officer obtained consent to conduct a warrantless search. *See Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002). *See also* Ark. R. Crim. P. 11.1 (2003) ("An officer may conduct searches and make seizures without a search warrant or other color of authority if consent is given to the search or seizure."). Consent to search the premises can only be given by a person who, by ownership or otherwise, is apparently entitled to give or withhold consent. *See* Ark. R. Crim. P. 11.2(c) (2003). Any search based on consent cannot exceed, in duration or scope, the limits of the consent given. *See* Ark. R. Crim. P. 11.3 (2003).

■ ■ The determination of third-party consent, like other factual determinations relating to searches and seizures, must be judged against an objective standard. *See Hilliard v. State*, 321 Ark. 39, 900 S.W.2d 167 (1995). Simply stated, that standard is: would the facts available to the police officer at the moment warrant a man of reasonable caution to believe that the consenting party had authority over the premises? *See id*. This court has recognized that a warrantless search can be valid where voluntary consent has been given by a third party with sufficient control or authority over the premises. *See Spears v. State*, 270 Ark. 331, 605

S.W.2d 9 (1980). Whether consent by that party is valid under the Fourth Amendment standards rests upon mutual use of the property by persons generally having joint access or control for most purposes. *See Grant v. State*, 267 Ark. 50, 589 S.W.2d 11 (1979). The pertinent question is whether the one giving consent possesses common authority or other sufficient relationship to the premises. *See id.*

In *United States v. Matlock*, 415 U.S. 164 (1974), the United States Supreme Court commented:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, *see Chapman v. United States*, 365 U.S. 610 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v. California*, 376 U.S. 483 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. at 172, n.7.

In the instant case, there is no question but that Timmons, as co-tenant, had the authority to consent to the search of common areas such as the living room. And it was from the living room that Deputy Brown saw the open bedroom door and that he, Deputy Delay, and Officer Crossland later saw into Love's bedroom through the open door and observed numerous items related to the manufacture of methamphetamine. Thus, these items seized were in the plain view of the officers. When police officers are legitimately at a location and acting without a search warrant, they may seize an object in plain view if they have probable cause to believe that the object is either evidence of a crime, fruit of a crime, or an instrumentality of a crime. *See Fultz v. State*, 333 Ark. 586, 972 S.W.2d 222 (1998).

■    Despite the dissent's contention to the contrary, two officers provided testimony to support a finding that some of the items seized were in plain view from outside the bedroom prior to the officers' search of the bedroom:

THE COURT:    Let me ask, could you see these items from outside the bedroom or did you actually have to go into the bedroom to see them or could you see them from outside the bedroom?

OFFICER CROSSLAND:    You could see some of the items on the bed. Some of them were sitting on like a end table. But to see all of them you would have to go into the bedroom, yes.

THE COURT:    But you could see some without?

OFFICER CROSSLAND:    Yes.

. . . .

PROSECUTOR:    And what did you — first of all, could you see whatever you found in the bedroom through the door?

DEPUTY BROWN:    Yes.

PROSECUTOR:    And what was it that you saw?

DEPUTY BROWN:    There was some needles and some different stuff laying on top of the bed and just at the foot of the bed there was a duffel bag full of various items. I'm not sure exactly what. And on the — there was a dresser that had a big glass jar with a clear liquid substance inside of it that you could see from the doorway.

PROSECUTOR:    This was all out in plain view?

DEPUTY BROWN:    Yes.

Because the officers were able to see drug-related items in plain view from the bedroom doorway prior to even entering the room, there was probable cause to seize those items. *See e.g., Fultz v. State, supra.*

■    We hold that the search was a valid one and that the drug paraphernalia was properly seized and that Love's motion to suppress was properly denied by the circuit court. *See Wright v.*

*State*, 593 N.E.2d 1192 (Ind. 1992) (holding that where police officers obtained appellant's roommate's consent to search, following appellant's arrest, and observed, from the hallway, a knife and sheath on appellant's dresser, there was no error in the admission of the evidence at trial, as the circuit court correctly concluded that the roommate's consent permitted the officers to lawfully search the common areas of the residence from which they could see the items in plain view).

Our affirmance is for a different reason than the reasons espoused by the circuit court. Nevertheless, this court has made it abundantly clear that we can affirm a decision by the trial court, albeit for a different reason. *See e.g., McCoy v. State*, 347 Ark. 913, 69 S.W.3d 430 (2002). There is also the point that Love testified that she shut her bedroom door while Deputy Brown testified that it was open when he walked into the house with Officer Crossland, Detective Reid, and Deputy Delay. Matters of credibility, of course, are for the circuit court, *see Davis v. State, supra*, but the court did not expressly decide that issue. In examining the totality of the circumstances, we give weight to Deputy Brown's testimony that the door was open, thereby enabling the police officers to look through the bedroom doorway and see at least some of the drug items, in plain view.

There is the suggestion, although it is not clear from the abstract or record, that Detective Reid or some other police officer may have entered the bedroom prior to the approach by Deputies Brown and Delay and Officer Crossland to the doorway, where they could see the drug-related items in plain view. It is incumbent upon a defendant/appellant to develop such issues at the suppression hearing. This was not done, based on the record before us, and we will not speculate on matters not fully developed. *See, e.g., Raymond v. State*, 354 Ark. 157, 118 S.W.3d 567 (2003). We note, however, that the dissent has clearly speculated on this point and done so in favor of Love, without citation to authority for doing so.

In sum, we affirm the circuit court on the basis that police officers were able to view the drug-related items which were in plain view from the bedroom doorway and testified to that effect. *See Wright v. State, supra*.

Affirmed.

HANNAH, J., dissents.

JIM HANNAH, Justice, dissenting. I respectfully dissent. There is no evidence showing that the contraband was in plain view. The plain-view exception requires that police view the contraband from where they are lawfully located. *Horton v. California*, 496 U.S. 128 (1990). The officers' testimony shows that the door to Love's bedroom was open when police entered the home, but there is no evidence showing what, if anything, was seen through that open door prior to police entering Love's bedroom to seize the contraband. Therefore, there is no evidence of anything being in plain view. The evidence offered only showed what police saw through Love's bedroom door after officers were already in her bedroom.

The majority quotes Officer Crossland and Officer Brown in a patently ineffective attempt to show that contraband was in plain view before police entered the bedroom. The quotes from Crossland and Brown are misleading. The issue is not what Crossland and Brown saw through the door when they were called to the door by officers already in Love's bedroom. Obviously, their testimony is useless on the issue of plain view because according to Crossland's and Brown's testimony, other officers were already in the room. What we do not have in this case is any evidence whatever of what, if anything, was seen by the officer who entered the room first. We do not even know which officer entered the room first because no officer would admit to entering the room first. The majority admits that Officer Brown did not look into the bedroom until "somebody hollered." Thus, it is obvious that the majority recognizes that Officer Brown could not offer any evidence on plain view. It appears that the majority is moving toward the use of harmless error under the plain-view doctrine.

Officer Brown testified that after someone hollered a discovery had been made in Love's bedroom, he went to the doorway of the bedroom and could see "needles. . . different stuff laying on the bed . . . and on the . . . dresser . . . a big glass jar with clear liquid substance inside of it." Officer Crossland testified that items could be seen on the bed and on an end table. However, neither Officer Brown nor Officer Crossland saw anything before police entered Love's bedroom. Both responded to a call by a never identified officer who was already in Love's bedroom. Officer Brown also testified that portions of the contraband were not visible from the doorway, and that they could only be seen upon entering the

room. Officer Crossland testified likewise. Was anything ever in plain view before officers entered the room? We do not know.

Officers Crossland, Reid, Stillwell, Delay, and Brown testified about the search and seizure. Officer Crossland testified that he did not discover the contraband in Love's bedroom, but that either Officer Delay or Officer Brown yelled to tell him of the discovery. Officer Crossland thought that Officers Brown and Delay went into Love's bedroom first. Officer Reid testified as follows:

Q. Do you recall who was the first one was to go up back there to this bedroom? If you don't know.

A. I was not there at that point and time.

Q. Someone called you to go back and see these items?

A. When everything took place I wasn't there. Dudley Crossland had called me after they'd already obtained permission to search.

Thus, Officer Reid was not the first officer to check out Love's bedroom. Officer Stillwell testified that he never entered the house, so obviously he did not enter the bedroom first. Officer Delay testified that he entered the bedroom once he heard another officer say he found something. Officer Delay was asked specifically which officer went into Love's bedroom before he did. He responded, "I don't know." Officer Delay thought Officers Crossland and Reid were in Love's bedroom before he entered. Finally, Officer Brown testified that he had no idea who went into Love's bedroom first. When asked who called out that he had found something in Love's bedroom, Officer Brown testified that he was not exactly sure, but he thought it might have been Officer Brian Berry. Officer Berry did not testify.

Strangely, no officer was willing to take the credit for finding the contraband in the bedroom. Even the police recognize their approach to the search was problematic with respect to consent and otherwise. When asked if it would have been simpler to get a search warrant, one officer testified, "Looking back now, yes." We have no idea who entered the bedroom first, let alone whether any officer who entered the bedroom and discovered the contraband saw anything in the bedroom before entering it. There is no evidence of anything being in plain view prior to the officer entering the bedroom and discovering the contraband. The ma-

jority affirms Love's conviction on an assumption. The majority's decision constitutes a denial of due process. The majority speculates that because Officer Brown testified that the door was open when he entered the house and because both he and Crossland testified that contraband could be seen from the door when they were later called there after officers were already in Love's bedroom, then the contraband was in plain view before officers entered Love's bedroom. Unfortunately, the record is utterly devoid of any evidence of plain view. No officer offered any testimony whatever regarding what, if anything, was in plain view. There simply is no evidence on the issue. The majority bases its decision on rank speculation.