**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0688n.06
Filed: September 24, 2007

**No. 06-4470**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| FRED JOHNSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| TRENT WEAVER; EARL WOGLEMUTH; | ) | SOUTHERN DISTRICT OF OHIO |
| OHIO DEPARTMENT OF NATURAL | ) | |
| RESOURCES DIVISION OF WILDLIFE; | ) | |
| SAMUEL W. SPECK; SCOTT ZODY; and | ) | |
| JAMES R. TUNNELL, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: MOORE and COOK, Circuit Judges; and ACKERMAN, District Judge.[*]

COOK, Circuit Judge. Fred Johnson filed this action under 42 U.S.C. § 1983 against Ohio Department of Natural Resources (ODNR) officers, claiming violation of the Fourth Amendment in searching his house, barns, and farm. The district court granted summary judgment in favor of the ODNR officers, and we affirm.

---

[*]The Honorable Harold A. Ackerman, Senior United States District Judge for the District of New Jersey, sitting by designation.

I

The disputed searches' genesis was a deer check-in station's call to ODNR officer Trent Weaver, reporting the delivery of a gun-shot carcass during Ohio archery season. Suspecting an out-of-season kill, Ohio Rev. Code §§ 1531.02, 1531.99, Weaver and fellow officer Erryl Wolgemuth thought it a prudent first investigatory step to visit the hunter responsible—conspicuously identified on the deer's tag as Jeremy MacIntosh, living at 10240 Carlisle Pike in Germantown, Ohio.

Arriving at the property the next morning, they found their investigation immediately stalled by the locked gate and "No Trespassing" signs a quarter mile up the driveway. As it turned out, MacIntosh's address was a tenant house on Johnson's seventy-acre fenced-in farm. And soon after the officers arrived, Johnson appeared, coming down the driveway on his way to work. He claimed that MacIntosh was gone and refused Weaver and Wolgemuth's entry onto the farm. Johnson repeatedly denied entry and became increasingly belligerent, sparking an altercation that resulted in Weaver and Wolgemuth arresting him.[1]

With Johnson in jail, Weaver and Wolgemuth returned to the farm, now accompanied by ODNR Investigator James Tunnell, and walked to MacIntosh's house, where they met and questioned MacIntosh (Johnson having lied about his absence). MacIntosh, who identified his relationship to Johnson as stepson, claimed that he shot the deer with a bow and arrow. Weaver,

---

[1]The arrest gave rise to a separate lawsuit, dismissed for failure to prosecute.

spotting the lie, suggested that MacIntosh show them the scene of the kill. After the group briefly

entered Johnson's barns, they walked the farm's fields, where Weaver noticed a 12-gauge shotgun

slug casing twenty-five yards from a bloody spot on the grass. At this point, MacIntosh recanted

his earlier story, told the officers that Johnson, not he, shot the deer, and memorialized his statement

in writing:

> On Saturday 07 October 2000 my step dad Fred Johnson killed a 16 point buck on the farm in German Township Montgomery County. He told me that he killed it with a shotgun. He didn't want to take it and check it in. I wanted it so Fred and I took it to the deer checking station. I gave false information to the person who computed the deer harvest form. I told them that I killed it with a bow and arrow. Later my dad and I took it to Payne's Deer Processor. The head went to Millard's Taxidermy in Carlisle.

With this statement, Weaver and Wolgemuth sought and obtained a search warrant. And

although the warrant listed the tenant house's address, 10240 Carlisle Pike, that evening Weaver,

Wolgemuth, and several other officers executed the warrant at Johnson's house at 10232 Carlisle

Pike. There, they seized three shotguns and several shells; testing later matched one of the guns to

the earlier-found spent casing.

Johnson filed a complaint in district court under 42 U.S.C. § 1983 alleging multiple

violations of his Fourth Amendment rights. In September 2006, the district court granted the

defendants' motion for summary judgment.

II

We review a district court's order granting summary judgment de novo, *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998), and will affirm if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c).

A

Johnson bases his first Fourth Amendment claim on the allegation that the officers trespassed when they defied his order to stay out and nevertheless proceeded up the driveway. While it is axiomatic that the Fourth Amendment protects the home and its curtilage, the "land immediately surrounding and associated with the home," *United States v. Oliver*, 466 U.S. 170, 180 (1984), it is equally clear that this protection does not extend to the home's neighboring open fields because those areas "do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter," *id.* at 179; *see also Hester v. United States*, 265 U.S. 57, 59 (1924) ("[T]he special protection accorded by the Fourth Amendment . . . is not extended to the open fields."). Because the driveway constitutes an "open field," Johnson holds no reasonable privacy expectation in it, and his efforts to shield that area from any manner of unwelcome guest prove inconsequential. *See United States v. Rapanos*, 115 F.3d 367, 372–73 (6th Cir. 1997) (explaining that the "presence of fences, closed or locked gates, and 'No Trespassing' signs on an otherwise open field . . . has no constitutional import"). True, the officers trespassed, but the *Oliver* Court confirmed that this state-law violation is of no constitutional moment:

> The law of trespass . . . forbids intrusions upon land that the Fourth Amendment would not proscribe. For trespass law extends to instances where the exercise of the right to exclude vindicates no legitimate privacy interest. Thus, in the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment.

466 U.S. at 183–84 (footnotes omitted). In light of these principles, the officers did not violate the Fourth Amendment in traversing the driveway.

Johnson attempts to distinguish his case from the average open fields case, citing his prior refusal to allow the ODNR officers entry. But a landowner who is present and attempting to bar entry has at most "a *subjective* expectation of privacy," and the Supreme Court rejects "the suggestion that steps taken to protect privacy establish that expectations of privacy in an open field are legitimate." *Rapanos*, 115 F.3d at 373 (quoting *Oliver*, 466 U.S. at 182). This additional factor therefore does not give rise to a Fourth Amendment violation. *Id.*

Nor did the officers violate Johnson's Fourth Amendment rights when they knocked on the tenant house door. MacIntosh lived there; Johnson's ownership alone does not create a reasonable expectation of privacy. *See, e.g.*, *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) (collecting cases); *Stoner v. California*, 376 U.S. 483 (1964); *Chapman v. United States*, 365 U.S. 610 (1961).

B

Johnson counters that the officers exceeded the open fields rule when they searched his barns. For summary judgment, we take as true that the officers searched the barns and that the barns

constitute curtilage. The district court nonetheless found that the officers were qualifiedly immune for lack of a clearly established right, based on the Supreme Court's decision in *Georgia v. Randolph*, 547 U.S. 103 (2006), and we agree.

The preliminary question is whether MacIntosh had authority to consent to a search of Johnson's barns. An exception to the Fourth Amendment's prohibition on warrantless searches applies where officers obtain voluntary consent to search, either from the person whose property is searched, *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)), or "from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected," *United States v. Matlock*, 415 U.S. 164, 171 (1974). Common authority enables a third party to consent to a search if that third party has "joint access or control for most purposes." 415 U.S. at 171 n.7. Even if third-party consent comes from a person without actual authority, the search is nonetheless valid if the police relied, in good faith, on the third party's apparent authority to consent to the search. *Rodriguez*, 497 U.S. at 188–89. An objective standard applies, and the search is valid if the officers reasonably could conclude from the facts available to them that the third party had authority to consent to the search. *See id.* at 186–89; *see also United States v. Ayoub*, No. 06-1610, 2007 WL 2323848, at *3 (6th Cir. Aug. 16, 2007).

The facts available to the officers in this case show that MacIntosh had apparent, if not actual, authority to consent to a search of the barns. First, the deer tag listed MacIntosh as the deer's owner

and 10240 Carlisle Pike, a residential house located on Johnson's farm, as MacIntosh's address. *Cf. United States v. Moore*, 130 F. App'x 728, 735 (6th Cir. 2005) (finding actual and apparent authority where third party "had signed the lease agreement, had a key to the apartment, was unconstrained in her movement within and to and from the apartment, and the rental contained her personal property"). Second, MacIntosh's unrebutted written statement informed the officers of his stepson relationship to Johnson. We have recognized that, "[a]s a general consideration, there is every reason to suppose that mature family members possess the authority to admit police to look about the family residence, since in common experience family members have the run of the house." *United States v. Clutter*, 914 F.2d 775, 777 (6th Cir. 1990) (twelve and fourteen year-old children could consent to search of mother's bedroom). And we have no difficulty applying this reasoning to the barns, which, Johnson admits, functioned for food and livestock storage, and as a second garage—in other words, as "areas of usage common to all members of the family." *Id.* Further, "absent special circumstances, all rooms in the residence can be said to be areas of usage common to all members of the family." *Id.* Those special circumstances embrace only situations where "family members . . . exclude from this common authority access to areas where they wish to maintain an expectation of privacy, even from other members of the family." *Id.*; *see also United States v. Gillis*, 358 F.3d 386, 391 (6th Cir. 2004) ("Guests and co-residents in a house may have privacy interests in specific property which cannot be waived by a third party's consent to a general search of the premises." (citing *United States v. Block*, 590 F.2d 535, 541–42 (4th Cir. 1978))). But the record includes no clues that Johnson locked the barns, or that he otherwise restricted

MacIntosh's access to them. Under these circumstances, the government carries its burden of demonstrating that the warrantless search of the barns was by consent because MacIntosh "enjoyed that degree of access and control over [these areas] that afforded [him] the right to permit inspection," *Clutter*, 914 F.2d at 778, and because the deer tag listed 10240 Carlisle Pike as MacIntosh's address and the officers understood him to be Johnson's stepson.

That leaves us to consider the effect of Johnson's prior refusal in light of the Supreme Court's recent holding in *Randolph* that if a potential defendant with self-interest in objecting is present and actually objects, a third party's consent does not suffice for a reasonable search. 547 U.S. at 121. The *Randolph* Court also condemned third-party consent where there is "evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Id.* Assuming that the officers violated the Fourth Amendment under *Randolph*, qualified immunity—specifically, its "clearly established" prong—shields them from personal liability.

To determine whether qualified immunity protects an official whose conduct violated a constitutional right, the court must consider whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the constitutional right was not clearly established at the time of the challenged conduct, qualified immunity is proper because "an official could not reasonably be expected to anticipate subsequent legal developments." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982). *Randolph*, far from applying clearly established law, was a departure.[2] In fact, the upshot of some of our pre-*Randolph* cases was the exact opposite—we found valid consent from third parties' common authority over shared premises even after a potential defendant had already refused the search. *See, e.g.*, *United States v. Sumlin*, 567 F.2d 684, 688 (6th Cir. 1977) ("We cannot see how the additional fact of Appellant's initial refusal to consent in any way lessened the risk assumed that his co-occupant would consent."); *J.L. Foti Constr. Co. v. Donovan*, 786 F.2d 714, 717 (6th Cir. 1986) (same). Thus, because the officers did not violate a right clearly established *at the time of the challenged conduct*, their claim to qualified immunity prevails.

C

Johnson next targets two defects in the search warrant the officers executed at his house. First, Johnson points out that every fact cited in the affidavit to establish probable cause resulted from the officers' interview with MacIntosh, suggesting that this information somehow poisoned the

---

[2]The *Randolph* Court itself noted the split of authority on whether one occupant may give valid consent to a search of shared premises when a co-tenant was present and objecting:

> All four Courts of Appeals to have considered this question have concluded that consent remains effective in the face of an express objection. See *United States v. Morning*, 64 F. 3d 531, 533–536 (CA9 1995); *United States v. Donlin*, 982 F. 2d 31, 33 (CA1 1992); *United States v. Hendrix*, 595 F. 2d 883, 885 (CAD.C. 1979) (*per curiam*); *United States v. Sumlin*, 567 F. 2d 684, 687–688 (CA6 1977). Of the state courts that have addressed the question, the majority have reached that conclusion as well. See, *e.g., Love v. State*, 355 Ark. 334, 342, 138 S. W. 3d 676, 680 (2003); *Laramie v. Hysong*, 808 P. 2d 199, 203–205 (Wyo. 1991); but cf. *State v. Leach*, 113 Wash. 2d 735, 744, 782 P. 2d 1035, 1040 (1989) (en banc) (requiring consent of all present co-occupants).

547 U.S. at 108 n.1.

warrant. True, the officers relied solely on MacIntosh's tip in obtaining the search warrant, but, as we explained above, the initial trespass onto Johnson's farm and the discussions with MacIntosh were permissible under the Fourth Amendment. In the absence of a Fourth Amendment violation, the trespass does not undermine the magistrate's probable-cause finding. *Cf. United States v. Hopper*, 58 F. App'x 619, 626 (6th Cir. 2003).

Second, Johnson argues that the search warrant violated the Fourth Amendment's particularity requirement because it listed an incorrect house number and did not adequately describe the contraband to be seized. To determine whether a warrant's description passes constitutional muster, we do not ask whether it "is technically accurate in every detail," but whether it is "sufficient to enable the executing officer to locate and identify the premises with reasonable effort [so that] there is [no] reasonable probability that another premises might be mistakenly searched." *United States v. Durk*, 149 F.3d 464, 465 (6th Cir. 1998) (internal citations and quotation marks omitted). Despite the incorrect address, the warrant satisfies this standard: the affidavit accurately described the house ("a 2-story Brown Brick with attached garage" and "brown roof"); described an unusual feature ("House has a black cattle fence on the east, south, and west side"); and identified Johnson as the occupant. Plus, the warrant's affiant had visited Johnson's farm that day, when MacIntosh disclosed the shotgun's location. *See id.* at 465 (warrant valid despite incorrect address); *United States v. Pelayo-Landero*, 285 F.3d 491, 495–96 (6th Cir. 2002) (same). And the warrant specifically identified the items sought, which were the alleged crime's tools and fruits. *See United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988).

D

Finally, Johnson contests the scope of the search at his home, appearing simply to argue that because "the guns and ammunition sought were immediately accessible," the officers' search was overbroad because it lasted an hour and included looking through private areas such as bedroom drawers and medicine cabinets. In other words, "once the shells were found," Johnson argues, the officers were not permitted to continue searching in "private areas." We disagree. Obviously more shotgun shells could be hidden elsewhere. This is particularly the case as the officers' affidavits reflect that they saw Johnson hurry into the house upon returning from jail. To find the shells—a small, easy-to-conceal item—the officers could reasonably look in medicine cabinets or bedroom drawers where such items could be hidden. Under these circumstances, we conclude that the officers' search of Johnson's home was reasonable. *See Brindley v. Best*, 192 F.3d 525, 531–32 (6th Cir. 1999).

III

We affirm the district court's judgment.

      **KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.** I concur in the judgment of the court.