Billy Joe BRUNSON a/k/a Joe Joe *v.* STATE of Arkansas

CR 88-3                                              753 S.W.2d 859

Supreme Court of Arkansas
Opinion delivered July 18, 1988
[Supplemental Opinion on Denial of Rehearing
September 19, 1988.*]

---

*Purtle, J., would grant rehearing.

*Charles L. Carpenter, Jr.*, for appellant.

*Steve Clark*, Att'y Gen., by: *J. Blake Hendrix*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. Appellant Billy Joe Brunson was found guilty of rape, aggravated robbery, and kidnapping (two counts) and was sentenced to one hundred and sixty years imprisonment. On appeal, Brunson contends the court erred in admitting certain items of evidence pursuant to the inevitable discovery exception to the exclusionary rule. It is argued that there was no evidence of an ongoing investigation focusing on Brunson which was sufficiently disconnected from his unlawful custodial detention. We disagree.

Brunson's second argument is that the trial court erred in allowing the victim's in-court identification as it was tainted by a pretrial lineup already determined to be fruit of the illegal arrest. We also find no merit to this point and affirm.

The facts relevant to the first argument are as follows. On May 12, 1987, several young blacks were involved in an aggravated robbery and kidnapping incident in southeast Little Rock in which a shotgun was used. The victim's 38 caliber handgun was taken, and he was then placed in the trunk of his car which was later abandoned.

The following day, at approximately 10:00 p.m., five black males approached a car occupied by a male and female which was parked near an intersection only a few blocks from where the incident of the previous day had taken place. One of those approaching the car wielded a handgun. The female occupant was forced into the rear seat, after which the five entered the vehicle and drove away. The male occupant was later placed in the trunk while the female was raped by several of her abductors. Certain items were taken from her person and her purse. She was then also placed in the trunk. Subsequently, the vehicle was abandoned.

Both victims escaped from the trunk, and by 11:30 p.m.

police officers began investigating the incident. Descriptions were obtained of the perpetrators, and fingerprints were lifted from the victim's car. Throughout the night and into the morning hours of May 14, officers worked on developing leads with respect to the events of both May 12 and 13.

By 8:00 a.m. on May 14, Detective Steelman was working with information which led him to a residence on West 9th in Little Rock. An individual identifying himself as Timothy Williams answered the door but was evasive in his answers to the detective's questions. Williams agreed to accompany Steelman to the police station and allowed the detective to enter the residence while Williams put on a shirt. Inside, Steelman observed two black males asleep on the living room floor—a shotgun nearby—and one black female asleep on the couch. Williams suddenly fled the scene. The detective placed himself between the sleeping individuals and the weapon and radioed for assistance. Appellant Brunson was one of the individuals asleep in the living room. He, a Rosalind Watson, and others were awakened, handcuffed, and taken into custody. The robbery victim of May 12 later identified a handgun found at the residence as his.

Brunson was advised of his rights at approximately 10:15 a.m. on May 14, but refused to make a statement. He was placed in a lineup by 11:25 a.m. and was identified by the rape victim as one of her attackers. He was fingerprinted and formally charged at 12:45 p.m.

Sometime before 3:00 p.m., in connection with an unrelated shooting incident, officers interviewed a suspect named Kevin Brown. During the interview, Brown disclosed names by now connected with the May 13 rape. Brown was given his *Miranda* rights, and a written statement was taken at 4:50 p.m. in which Brown implicated himself in the rape incident and identified individuals named Rodney, Bryan Crutchfield, Tony, and Billy (identified by others as appellant Brunson) as co-participants. Billy was identified as the one who drove the victim's car. Brown's statement otherwise corroborated the rape victim's version of the events of May 13.

Rosalind Watson, who was being interviewed as a suspect in the May 12 robbery/kidnapping, was also interviewed at 4:00 p.m. as to any information she might have concerning the May 13

rape. Watson named Brunson, a Johnson, Kevin Brown (her brother), a Tony, and a Bryan as individuals involved in the rape/ kidnapping/robbery based on earlier conversations she had with Brunson and a Rodney Johnson.

Through examination of police records and pictures, Detective Steelman discovered that Timothy Williams's real name was James Goss. Based upon that information and the information supplied by Rosalind Watson and Kevin Brown, warrants were issued shortly after 4:00 p.m. on May 14 for the arrests of Goss and Crutchfield. Both were arrested by 6:45 p.m. By 7:45 p.m. Crutchfield had implicated persons named Joe Joe, Tony, Rodney, and Spider. Crutchfield identified appellant Brunson as Joe Joe, and his statement otherwise corroborated the rape victim's statements to police. Goss, who had been arrested along with Crutchfield, gave a statement at 7:20 p.m. in which he implicated himself and supplied the names Joe Joe, Spider, Rodney, and Mark.

At trial, the victim made an in-court identification of Brunson as one of her attackers. She described in detail the events leading up to her escape from the trunk of her car and identified Billy Joe Brunson as the individual who drove the car and as one of those who later raped her. The State also introduced the fingerprints taken from Brunson after his arrest matching those lifted from the victim's car, the lineup identification by the victim, and testimony by a forensic serologist concerning blood and saliva samples taken from Brunson linking him to the rape. Brunson filed a motion to suppress the fingerprints and the lineup identification and objected to the testimony concerning the blood and saliva samples because the evidence was fruit of an illegal arrest. The trial court agreed that Brunson had been taken into custody without probable cause, but reserved a ruling on the admissibility of the challenged items of evidence until the State could develop its theory of inevitable discovery. The court eventually admitted the evidence on that basis.

The primary thrust of Brunson's first argument is that there is no evidence of an ongoing investigation focused on Brunson in connection with the May 13 crimes which can be disassociated from the events surrounding his illegal arrest. On that basis, Brunson contends that when the events surrounding his arrest are

removed, including any witnesses and information gathered as a result of his unlawful detention, the police had nothing that, inevitably, would have led to the discovery of Brunson as a participant and, hence, to the production of the challenged evidence.

The inevitable discovery exception to the exclusionary rule was specifically adopted by the United States Supreme Court in *Nix* v. *Williams*, 467 U.S. 431 (1984). In part, the Court stated:

> The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections.
>
> . . .
>
> It is clear that the cases implementing the exclusionary rule 'begin with the premise that the challenged evidence is *in some sense* the product of illegal governmental activity.' [Emphasis in original—citation omitted] Of course, this does not end the inquiry. *If the prosecution can establish by a preponderance of the evidence that the information* ultimately or *inevitably would have been discovered by lawful means* . . . then the deterrence rationale has so little basis that the evidence should be received. [Emphasis ours.]

Three years prior to the holding in *Nix*, this court on its own adopted the inevitable discovery rule, but we stated, "the state must prove by *clear and convincing* evidence that it would have acquired the items through legal means . . . [and] the officers involved must have acted in good faith in accelerating the discovery of the evidence." [Emphasis ours.] *Fain* v. *State*, 271 Ark. 874, 611 S.W.2d 508 (1981). *Nix*, however, merely required that the State make its showing by a preponderance of the evidence, and the Court specifically rejected the requirement that the prosecution make a threshold showing of good faith conduct by the police.

This court cited *Nix* with approval in *Mitchell* v. *State*,

294 Ark. 264, 742 S.W.2d 895 (1988), where we stated, "[t]he state must prove the 'inevitable discovery' would have occurred by a preponderance of the evidence." We find the standard adopted by the Supreme Court in 1984 well suited to the task of securing the goals of the exclusionary rule while assuring that the police are not placed in "a *worse* position than they would have been in if no unlawful conduct had transpired." *Nix* v. *Williams*, 467 U.S. at 445. Contrary to our position in *Fain*, we now find that it is not incumbent that the State establish good faith conduct as to the accelerated discovery of the evidence (we note that in the present matter the trial court found no evidence of bad faith nor does the record indicate that Detective Steelman acted in bad faith).

The trial court was correct in concluding that Brunson's identity as a participant in the May 13 crimes—hence the challenged evidence—inevitably would have been discovered by lawful means. The collective information possessed by the police pursuant to the statements provided by Rosalind Watson, Kevin Brown, James Goss, and Bryan Crutchfield—independent of Brunson's unlawful custodial detention—is persuasive evidence that Brunson's identity, his eventual arrest, and therefore discovery of the challenged evidence was inevitable.

Insofar as Goss is concerned, Detective Steelman's contact with that individual came prior to any illegality, and the subsequent arrest of Goss was neither aided by nor tainted by the events surrounding Brunson's detention. When Goss was questioned, he implicated Brunson (Joe Joe). Nor was the arrest of Kevin Brown associated with Brunson's illegal arrest, and statements by Brown led to the arrest of Crutchfield. Both Brown and Crutchfield implicated Brunson, either directly or by identifying "Billy" as the driver of the victim's car.

As to Rosalind Watson, she was taken to the police station along with Brunson and others who had been discovered at the residence. She was questioned as a suspect in connection with the robbery on May 12 but was questioned as a potential witness in connection with the rape and related crimes on May 13. She implicated Brunson directly as to that incident.

Relying on *United States* v. *Ceccolini*, 435 U.S. 268 (1978), Brunson seeks to exclude any statements provided by Watson. In

*Ceccolini*, a lower court had "granted respondent's motion to suppress the testimony of [a witness], because she 'first came directly to the attention of the government as a result of an illegal search' and the Government had not 'sustained its burden of showing that [the witness'] testimony definitely would have been obtained without the illegal search.'" The court of appeals affirmed but the Supreme Court reversed.

■ Although the Supreme Court reaffirmed the proposition that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officer's action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits," the Court qualified its position. The Court found that in determining whether the exclusionary rule with its deterrent purpose should be applied to cases involving live-witness testimony, the rule's benefits should be balanced against its costs, and, in evaluating the standards for application of the rule to live-witness testimony in light of this balance, certain material factors must be considered. These factors include the time span between the Fourth Amendment violation and the witness's testimony; the degree of free will exercised by the witness; and the fact that exclusion of the witness's testimony would perpetually disable the witness from testifying about relevant and material facts regardless of how unrelated such testimony might be to the purpose of the original illegality or the evidence discovered thereby.

Applying these factors to the present case, it is clear that the time span between Brunson's custodial detention without probable cause and Rosalind Watson's statement to officers on that same day implicating Brunson is not great. It is also clear that Watson was a young black female in custody as a suspect in the May 12 robbery. However, we find no evidence of record that her statements implicating Brunson in the May 13 rape were not of her own free will. Moreover, exclusion of Ms. Watson's statements would perpetually disable a witness from testifying about relevant and material facts under circumstances where the testimony is, for all practical purposes, unrelated to the factors which rendered Brunson's detention unlawful.

■ Brunson further objected to the introduction of the statements by Rosalind Watson (who was unavailable as a

witness at trial) on grounds of hearsay. It is clear, however, that the testimony was received not to prove the truth of the matter asserted, i.e., that Brunson committed the crimes as described (*see* Rule 801(c) of the Arkansas Rules of Evidence), but rather to show that the discovery of Brunson's identity was inevitable. As such, the argument is without merit.

Taken as a whole, we are convinced that the trial court was correct in concluding that the State met its burden in demonstrating that the challenged evidence inevitably would have been discovered by lawful means. We find no error on this point.

Brunson's second argument is also without merit. At trial, the female victim testified that Brunson was one of the five individuals who had kidnapped her. She first described him as the one who drove her car from where it had been parked and that he later moved to the rear seat after the car was stopped near a house with a yard light which illuminated the interior of the car. She testified that Brunson raped her and attempted other sexual contact and that she was able to observe the clothing and faces of her attackers on several occasions for a total of at least fifteen to twenty minutes. She was able to view Brunson directly when she was placed in the trunk and later when the trunk was opened and she was slapped and told not to look at the individuals. She described Brunson as a young black male with bushy hair who was wearing a red T-shirt, a cap, and loud Hawaiian shorts.

When the State asked the victim whether she was able to identify her attackers at an earlier lineup and whether she could identify anyone from that night as being present in the courtroom, counsel for the defense objected on the grounds that the lineup was fruit of the illegal arrest, that the police had directed those participating in the lineup to speak, that there was no picture of the lineup participants, and that there was only a general description by the officers testifying at trial as to whether the participants were similar in height, weight, and looks. Counsel further objected that it was dark and raining at the time of the alleged rape, that the victim only gave a general description of her attackers, and that any in-court identification should be suppressed as tainted by the lineup. The trial court agreed that the lineup was fruit of the illegal arrest but allowed the victim to make an in-court identification provided that the State could

show that the identification was based upon the victim's observations at the time of the crime.

Both parties rely upon the Supreme Court's decision in *United States* v. *Crews*, 445 U.S. 463 (1980), as dispositive of the admissibility of the in-court identification. In *Crews*, the Court found that although lineup identifications which were fruit of a Fourth Amendment violation might under some circumstances render an in-court identification inadmissible, where the courtroom identification rested upon an independent recollection of the victim's initial encounter with the assailant, uninfluenced by the pretrial proceedings, the in-court identification need not be suppressed. The Court found it significant that the victim in *Crews* had viewed her assailant at close range for a period of 5-10 minutes under excellent lighting conditions with no distractions, that the respondent closely matched the description given by the victim immediately after the crime, that the victim failed to identify anyone else and had twice selected respondent in nonsuggestive pretrial proceedings, and that only a week had passed between the victim's initial observation of the assailant and her first identification of him.

In *Burnett* v. *State*, 295 Ark. 401, 749 S.W.2d 308 (1988), this court quoted from *Crews* and stated that a victim's in-court identification of the accused has three distinct elements. First, the victim must be present at trial to testify as to what transpired between her and the offender, and to identify the defendant as the culprit. Second, the victim must possess knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from her observations of him at the time of the crime. Third, the defendant must also be physically present in the courtroom so that the victim can observe him and compare his appearance to that of the offender.

We have closely examined the record before us in light of *Crews* and find that the trial court's determination to permit the in-court identification was proper. The victim was able to view Brunson for several minutes in the illuminated car. Her description of Brunson after her escape from the trunk matched Brunson in all respects, and she failed to identify anyone else as having been the driver of her car and the one who subsequently raped her. She had selected Brunson in the lineup—as to which we find no

evidence of record indicating suggestiveness—and that identification occurred only hours after the crime. She was present at trial and testified as to what transpired between her and Brunson. She reconstructed the crime and identified Brunson—who was present at trial—as one of the offenders. After identifying him at trial, she stated, "I remember him, with no doubt, from the incident." Accordingly, we find no error on this point.

On the rape charge, Brunson was sentenced to life. In accordance with Rule 11(f) of the Rules of the Supreme Court and the Court of Appeals, we have examined all other objections made during the trial. We find no error.

Affirmed.

PURTLE, J., concurs.

JOHN I. PURTLE, Justice, concurring. Another chip at the Fourth Amendment! I concur in order to defend our opinion in *Fain* v. *State*, 271 Ark. 874, 611 S.W.2d 508 (1981), not merely because I wrote the opinion for the court, but because I believe *Fain* reflects the correct expression of the Fourth Amendment as it relates to the "inevitable discovery" exception to the exclusionary rule. Is it not enough for this court and the United States Supreme Court to constantly engineer new exceptions to the exclusionary rule? Must we also broaden the scope of the exceptions themselves to the point where there is nothing left of the rule and the Fourth Amendment except empty words on faded paper? If we cannot expect our public police officers to act in "good faith" at all times, then something is wrong with the system. Curiously, there is absolutely nothing in the record to indicate that Detective Clyde Steelman was not only acting within the law at all times, but that he was also acting in "good faith." Why, then, does this court choose to "water down" the Fourth Amendment when there is absolutely no hint of "bad faith" on the part of the police?

The reason for deleting the "good faith" requirement on the part of the officers escapes me completely. Inevitably it will be used for the purpose of allowing the introduction of evidence obtained as a result of unlawful entries by officers. A cure such as this is worse than the disease.

The opinion in *Nix* v. *Williams*, 467 U.S. 431 (1984), states

in part:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received.

The present decision of this court completely ignores the fundamental purpose of the exclusionary rule—to deter "bad faith" conduct on the part of the government.

The state is no more justified in violating the law than those accused by the state of doing so. I can only pray that the Fourth Amendment is rediscovered before it is forgotten.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
### SEPTEMBER 19, 1988

756 S.W.2d 457

Per Curiam. The petitioner, Billy Joe Brunson, was convicted on charges of rape, aggravated robbery, and kidnapping (two counts). We affirmed. *Brunson v. State*, 296 Ark. 220, 753 S.W.2d 859 (1988). Brunson petitions this court for a rehearing on the grounds that at the time briefs were originally filed he had requested by letter that the case be set for oral argument—which was never done. In support of his petition, Brunson alleges five errors of fact or law in our opinion of July 18, 1988, and requests that we vacate the opinion and set the case for oral argument.

While we acknowledge the inadvertent error by the clerk in

failing to set the case for oral argument, our examination of Brunson's arguments in his petition for rehearing convinces us that our July opinion contains no error. Accordingly, the petition for rehearing is denied.

PURTLE, J., would grant.