Daniel R. BRESHEARS *v.* STATE of Arkansas

CA CR 05-393                    .                    228 S.W.3d 508

Court of Appeals of Arkansas
Opinion delivered February 15, 2006

*Darrell Blount*, for appellant.

*Mike Beebe*, Ark. Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

JOSEPHINE LINKER HART, Judge. Daniel R. Breshears was convicted in a Garland County jury trial of manufacturing methamphetamine and doing so in the presence of a child. He was sentenced to forty years on the manufacturing charge and an additional term of ten years to be served consecutively for the enhancement. On appeal, he argues that the trial court erred in refusing to grant his motion to suppress evidence seized by police during an illegal search of his residence. We agree, and we reverse and remand.

At the hearing on Breshears's motion to suppress, Garland County Sheriff's Deputy Ray Cameron testified that on March 5, 2004, he was dispatched to 134 Wyles Lane in Jessieville in response to a complaint of criminal trespass. According to Deputy

Cameron, he "knocked on the door and a man [Breshears] come to the door, and I asked him was he supposed to be living there and he said yes." He then asked dispatch to call the landlord, R. L. Wyles. When Wyles arrived, he told Deputy Cameron that "no one was supposed to be living there." Wyles subsequently entered the mobile home and invited Deputy Cameron to accompany him.

Once inside, Deputy Cameron encountered a woman who appeared to be "about eight months pregnant" and a "little baby running around," which gave him the impression that "somebody was living there." He also noticed a "strange chemical odor," along with "needles and chemicals to make meth with, and generators." He claimed that he did not "search" the house for the suspected contraband but was merely "trying to secure it and check it out to see if anybody was living in it." Nonetheless, Deputy Cameron noticed drug paraphernalia "laying on the cabinet and in the floor" in the kitchen/living room area. According to Deputy Cameron, his "eyes were burning," and he ordered everyone outside while he called the Drug Task Force.

On cross-examination, Deputy Cameron admitted that when Breshears answered the door, Breshears told him that he was living in the mobile home, although he claimed that Breshears "didn't say nothin' 'bout rent." He admitted that he asked for consent to search, but Breshears refused to allow him to enter. Deputy Cameron also admitted that Wyles did not present any documents showing that he owned the dwelling and that Breshears "seemed to recognize Mr. Wyles" when the landlord came to the residence.

Wyles testified that he was the owner of the dwelling at 134 Wyles Lane and the mobile-home park in which it was situated. He stated that Breshears had rented one of his mobile homes and was living in it on March 5, 2004. Wyles noted, however, that he had "evicted" Breshears, and when he noticed smoke coming out of the vent pipe of the mobile home, he called the police. When he arrived at the scene, he found that Breshears was "still" in the dwelling. He acknowledged that Breshears "wouldn't let the police in; and they'd called me and I'd come up there 'cause I own the trailer." Wyles stated that he gave the police "the okay to go in." Later, he signed a form to consent to the search.

On cross-examination, Wyles confirmed that Breshears was renting the trailer at the time the police entered. He claimed that he had "evicted" him by either putting an eviction notice on the

door or handing it to him. The notice gave Breshears seven days to vacate. Wyles admitted that, prior to the time he gave the police permission to enter Breshears's home, he had not been inside because "I don't check on the tenants. If everybody's paying rent good, I don't check on 'em, and I — I never had been in his trailer."

Garland County Sheriff's Department Investigator Cory DeArmon testified that he was assigned to the Eighteenth East Drug Task Force on March 5, 2004, when he was summoned to Breshears's residence. Upon arrival, he was told by a Garland County deputy that there was a suspected meth lab inside. Wyles gave him the "notice to quit" and told him that no one was supposed to be living there. Investigator DeArmon asked for and received from Wyles consent to search the trailer. Inside, he found components of a meth lab. DeArmon admitted that he knew that the law required that a tenant be given ten days' notice to vacate when eviction is sought by a landlord. He confirmed that the only documentation presented to him was Wyles's notice, dated February 24, 2004, on which Wyles had scratched out the ten and wrote "7". DeArmon also conceded that the notice also recited that "date of service, Saturday, Sunday, and legal holidays" were expressly excluded from the time to vacate. Nonetheless, he claimed that he understood the law to allow a landlord to re-enter the dwelling after the expiration of ten days. DeArmon also stated, however, that he did not simply rely on the documentation but also on the information that Deputy Cameron gave him concerning the propriety of entering Breshears's residence. The trial court denied the motion to suppress.

On appeal, Breshears argues that the trial court erred in refusing to grant his motion to suppress evidence seized by police during an illegal search of his residence. He notes that there were actually two searches, the first by Deputy Cameron and the second by Drug Task Force officers. Breshears asserts that Deputy Cameron was not entitled to rely on the consent of the landlord to enter the residence, and therefore, evidence obtained by police during the subsequent illegal entry must be suppressed under the doctrine of "fruit of the poisonous tree." Breshears acknowledges that under *United States v. Matlock*, 415 U.S. 164 (1974), consent to search may be granted by a third party "if freely and voluntarily given," provided the party has "actual or apparent authority to grant the consent." He concedes that Wyles freely and voluntarily gave the consent, but asserts that Wyles had neither actual nor

apparent authority to consent. Breshears further notes that *Matlock* provides that "the validity of the consent under the Fourth Amendment standards cannot rest upon the ownership of the premises. Instead it rests upon mutual use of the property by persons generally having joint access or control for most purposes." Citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990), for the proposition that common authority must not be inferred and the burden is upon the State to prove it exists, Breshears argues that the burden is not met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. He contends that Deputy Cameron made no inquiry into Mr. Wyles's status as a person who had mutual use of or equal access to the property, even though this was the type of situation where "the facts known by police cry out for further inquiry." Accordingly, it was not reasonable for the police to proceed on the theory that "ignorance is bliss."

Regarding the second search, Breshears argues that because Deputy Cameron's entry was illegal, the Drug Task Force's subsequent entry was likewise illegal and the evidence seized was fruit of the poisonous tree. Furthermore, he asserts that the second search could not be found to be independently valid because the notice to quit that was provided to the Drug-Task-Force officers and the attendant circumstances that were made known to the Drug Task Force, including the fact that Breshears was obviously residing in the mobile home, did not support a reasonable conclusion that Wyles had the legal authority to enter the residence or consent to the police's entry. Breshears notes that the eviction procedure relied on by Wyles did not comport with Arkansas Code Annotated section 18-16-101 in either the length of time necessary for proper notice or in the steps required to retake possession of the property, and therefore, the police's entry was a mistake of law, and not a mistake of fact. We find these arguments persuasive.

Our standard of review for a trial court's action granting or denying motions to suppress evidence obtained by a warrantless search requires that we make an independent determination based upon the totality of the circumstances, giving respectful consideration to the findings of the trial judge. *Love v. State*, 355 Ark. 334, 138 S.W.3d 676 (2003). We give considerable weight to the findings of the trial judge in the resolution of evidentiary conflicts and defer to the superior position of the trial judge to pass upon the credibility of witnesses. *Id.*

Illegal entry by law enforcement officers into the homes of citizens is the "chief evil" the Fourth Amendment is intended to protect against and therefore is of the highest degree of seriousness. *Payton v. New York*, 445 U.S. 573 (1980). It is settled law in this state that warrantless entry into a private residence is presumptively unreasonable under the Fourth Amendment. *Latta v. State*, 350 Ark. 488, 88 S.W.3d 833 (2002). Nonetheless, that presumption may be overcome if the police officer obtained consent to conduct a warrantless search. *See Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002); *see also* Ark. R. Crim. P. 11.1 (2003) ("An officer may conduct searches and make seizures without a search warrant or other color of authority if consent is given to the search or seizure."). However, consent to search the premises can only be given by a person who, by ownership or otherwise, is apparently entitled to give or withhold consent. Ark. R. Crim. P. 11.2(c) (2003). The determination of third-party consent, like other factual determinations relating to searches and seizures, must be judged against an objective standard. *See Hillard v. State*, 321 Ark. 39, 900 S.W.2d 167 (1995). The test is: "would the facts available to the police officer at the moment warrant a man of reasonable caution to believe that the consenting party had authority over the premises?" *Id.*

■   We conclude that Deputy Cameron's initial intrusion into Breshears's residence was not based on facts and circumstances that overcame the presumption that his warrantless intrusion was unreasonable. Deputy Cameron testified that he knew that Breshears resided in a mobile home park where the residents rented their dwellings from Wyles. Furthermore, it was obvious to Deputy Cameron that when he arrived at Breshears's dwelling that the occupants were not simply trespassing, but rather were "living there." Indeed, if Deputy Cameron had any doubt as to that fact, it should have been dispelled by Breshears's unequivocal declaration that he lived there. Further, when Wyles arrived, Deputy Cameron perceived that Wyles and Breshears were acquainted with each other. Under these circumstances, we believe that it was unreasonable for Deputy Cameron to rely on Wyles's consent to enter Breshears's residence without further inquiry and further evidence that Breshears had been lawfully evicted. Deputy Cameron's reliance on the fact that Wyles was the owner of the property and his claim that Breshears was trespassing as his sole basis for entry into a dwelling known by the officer to be a rental unit was the type of consent that was of course long ago found not

to pass constitutional muster. *See Chapman v. United States*, 365 U.S. 610 (1961) (holding that a landlord could not validly consent to the search of a house he had rented to another). We hold that the Fourth Amendment required Deputy Cameron to do more than simply take Wyles's "word" that it was permissible for him to enter. We believe that this situation is clearly analogous to *Goodman v. State*, where we held that it is not reasonable for the police to proceed on the theory that "ignorance is bliss." 74 Ark. App. 1, 45 S.W.3d 399 (2001) (quoting 3 Wayne R. LaFave, *Search and Seizure* § 8.3(g) at 749 (3d ed. 1996)). As the United States Supreme Court stated more than a quarter-century ago, "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573 (1980).

■ Likewise, the second search failed to comport with the dictates of the Fourth Amendment. Investigator DeArmon insisted that he relied in large part on the assurance of Deputy Cameron that he had authority to enter Breshears's residence. However, Deputy Cameron summoned the Drug Task Force to the scene because of the information that Cameron had gathered during his unlawful intrusion into Breshears's residence. The mere fact that entry by the Drug Task Force was undertaken at the behest of law enforcement does not change the fact that Wyles did not have the authority to give constitutionally-valid consent.

Moreover, the second search undertaken by the Drug Task Force proceeded despite clear evidence that their search was illegal. As noted previously, while Deputy Cameron simply relied on Wyles "word," Wyles actually presented Investigator DeArmon with a copy of the "notice to quit" that Wyles had left on Breshears's door, and DeArmon knew that the document did not comport with the statutory ten-day notice required before a landlord could begin the process to re-enter leased premises. *See* Ark. Code Ann. § 18-16-101. As we said in *Goodman v. State, supra*, "To determine whether the police officers had a reasonable caution in the belief that [a third party] had authority over the premises (*i.e.*, apparent authority), we must first establish that the warrantless search was based on a mistake of fact, not a mistake of law." (citing *United States v. Whitfield*, 939 F.2d 1071, 1073 (1991)). Here, we agree with Breshears that Investigator DeArmon made a mistake of law, not a mistake of fact, and therefore, we hold that Investigator DeArmon's assessment that Wyles had apparent

authority to consent to the warrantless entry into Breshears's residence was unreasonable. Accordingly, we hold that the trial court also erred in failing to suppress the evidence obtained in the second search.

■ Finally, we note that Breshears argues that the statement that he gave to police after he had been arrested is also fruit of the poisonous tree and should be suppressed as well. We agree and hold that the trial court also erred in failing to suppress his statement.

Reversed and remanded.

GLADWIN, ROBBINS, BIRD, and GRIFFEN, JJ., agree.

PITTMAN, C.J., dissents.

JOHN MAUZY PITTMAN, Chief Judge, dissenting. This is an appeal from a conviction of manufacturing methamphetamine in the presence of a minor. Appellant argues that the evidence seized during two warrantless searches of his trailer should be suppressed. The majority has reversed on the grounds that both searches were invalid. I dissent because I believe that the first search was valid, and because the items seized during the second search would have inevitably been discovered as a result of the initial, valid search of the premises.

Mr. Wyles was the owner of a trailer. He testified that he believed that the former tenants had vacated the trailer after he took steps to evict them for nonpayment of rent so that, when he saw smoke coming from the trailer on March 5, he called the police because no one was supposed to be there. When Garland County Deputy Sheriff Ray Cameron arrived at the trailer in response to the criminal trespass complaint, appellant told him that he lived there and refused to let him in. Deputy Cameron then had his dispatcher call Mr. Wyles, who came to the scene and reaffirmed that no one was supposed to be living there. Mr. Wyles gave Deputy Cameron permission to enter the trailer. When Deputy Cameron did so he smelled a strong chemical odor and "saw a lady that was about eight months pregnant, and a little baby." Deputy Cameron also saw syringes, generators, and chemicals suspected to be involved in the manufacture of methamphetamine. The chemical vapors were sufficiently strong to cause Deputy Cameron's eyes to water, and he ordered all of the occupants to leave the trailer and called the Drug Task Force to the

scene. The Drug Task Force arrived, was shown the "notice to quit" by Mr. Wyles and, based on Mr. Wyles's permission, reentered the trailer and secured the items seen by Deputy Cameron.

There were thus two warrantless searches, both of which were based on Mr. Wyles's permission. I believe that the first search was valid. So long as a searching police officer reasonably believes that a person giving consent had authority to do so, the consent is valid, notwithstanding a later determination that the consentor had no authority. *Norris v. State*, 338 Ark. 397, 999 S.W.2d 183 (1999); *Grant v. State*, 267 Ark. 50, 589 S.W.2d 11 (1979). The question is whether, on the facts available at the moment, a person of reasonable caution would be warranted in the belief that the consenting party had authority over the premises. If so, the search is valid. *Illinois v. Rodriguez*, 497 U.S. 177 (1990). Here, Deputy Cameron had prior knowledge that Mr. Wyles was the owner of the trailer court, and there is no evidence that the deputy knew appellant or that appellant had ever rented the trailer. Furthermore, Deputy Cameron was not called to evict a holdover tenant but was instead sent to investigate a complaint of criminal trespass. When Deputy Cameron, after much knocking, induced appellant to answer the door, appellant made no claim of right to the property other than saying that he "lived there." Despite the majority's assertion to the contrary, Deputy Cameron did conduct a further investigation at this point by contacting the complainant for clarification. When Mr. Wyles arrived in response to Deputy Cameron's call, Mr. Wyles told him nothing about the attempted eviction or appellant's status as a tenant, but only that Mr. Wyles had noticed smoke coming from the trailer and that "no one was supposed to be living there." Further investigation therefore *was* conducted in this case, and led only to further indications that appellant was indeed engaged in criminal trespass, the very offense Deputy Cameron had been called to investigate. Under these circumstances, I think it ludicrous to conclude, as the majority does, that Deputy Cameron could not reasonably believe that Mr. Wyles had authority to consent to the a search of the trailer.

The second search, in my view, cannot be justified on these grounds because the Drug Task Force Officers were, on arrival, informed by Mr. Wyles that the matter was actually an eviction based on faulty process. They could not, at this point, reasonably rely on Mr. Wyles's consent. Nor, in the absence of a more imminent danger, could they conduct a search solely on the basis

of exigent circumstances pursuant to our holding in *Loy v. State*, 88 Ark. App. 91, 195 S.W.3d 370 (2004). They should have secured a warrant.

Nevertheless, although the second search was illegal, the fruits thereof need not be suppressed because they would have inevitably been discovered because of the evidence obtained during the initial, legal search. The doctrine is explained in *McDonald v. State*, 354 Ark. 216, 225-26, 119 S.W.3d 41, 47 (2003), a case involving facts so similar to those presented here as to warrant quotation at length:

> McDonald advances a similar search-and-seizure challenge in connection with Sergeant Jones's actions in recording the VIN number on the red four-wheeler parked in the front yard. We need not, however, address the propriety of those warrantless activities because the lawful discovery that the mule was stolen would have inevitably led to the discovery that the red four-wheeler was also stolen. Stated another way, even if we were to conclude that McDonald's constitutional rights were violated, the circuit court's denial of his motion to suppress would still be affirmed pursuant to the "inevitable discovery" doctrine. *See, e.g., Thompson v. State*, 333 Ark. 92, 966 S.W.2d 901 (1998).
>
> We have held that suppressed evidence is otherwise admissible if the State proves by a preponderance of the evidence that the police would have inevitably discovered the evidence by lawful means. *Miller v. State*, 342 Ark. 213, 27 S.W.3d 427 (2000). In 1988, this court adopted the Supreme Court's rationale in upholding the "inevitable discovery" doctrine:
>
>> This court cited *Nix* with approval in *Mitchell v. State*, 294 Ark. 264, 742 S.W.2d 895 (1988), where we stated, "[t]he state must prove the 'inevitable discovery' would have occurred by a preponderance of the evidence." We find the standard adopted by the Supreme Court in 1984 well suited to the task of securing the goals of the exclusionary rule while assuring that the police are not placed in "a worse position than they would have been in if no unlawful conduct had transpired." *Nix v. Williams*, 467 U.S. 431, 445, 104 S.Ct. 2501, 2509-2510 (1984).
>
> *Brunson v. State*, 296 Ark. 220, 226, 753 S.W.2d 859, 861 (1988).
>
> We concluded in *Miller* that, even if the police officers' conduct in entering the rear of the defendants' residence after getting no

response at the front door resulted in an illegal search, it was proper for the trial court to deny the defendants' motion to suppress evidence seized from their home under the "inevitable discovery" doctrine, where an officer who was standing in a parking lot next to the defendants' residence observed marijuana growing in their backyard. *Miller v. State, supra.* Similarly, in this case, the police lawfully recorded the VIN number on the stolen mule parked in the driveway. That information alone would have provided sufficient probable cause to procure the search warrant. Armed with a valid search warrant, the officers would have recorded the VIN number from the red four-wheeler and discovered that it was stolen. We are convinced that the State has established by a preponderance of the evidence that the police would have inevitably discovered the evidence by lawful means.

In my view, the sights and smells apparent to Deputy Cameron during the initial, valid search would unquestionably have supported issuance of a warrant for the search of the trailer, and inevitable discovery has been established by a preponderance of the evidence. I would affirm on that basis, and I respectfully dissent.