Jason Wayne BURROUGHS *v.* STATE of Arkansas

CA CR 05-1169 241 S.W.3d 280

Court of Appeals of Arkansas
Opinion delivered October 11, 2006

*Darrel Blount*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

DAVID M. GLOVER, Judge. Appellant, Jason Wayne Burroughs, was tried by a jury for the offense of manufacturing methamphetamine. He was tried as a habitual offender, found guilty, and sentenced to twenty years in the Arkansas Department of Correction. As his sole point of appeal, he contends that the trial court erred in denying his motion to suppress the evidence that was seized from his house because "the officers that furnished the information leading to the issuance of the search warrant were in his home illegally." We attempted to certify this case to our supreme court but certification was denied. We find merit in appellant's argument and reverse and remand this case to the trial court for proceedings consistent with this opinion.

## The Suppression Hearing

At the suppression hearing, Lieutenant Allen Story, a Hot Springs police officer, testified that on September 9, 2004, he was assisting Arkadelphia police officers who held warrants for a burglary suspect. He said that they went to the residence located at 247 Glade Street in Hot Springs, which was appellant's residence, and knocked on the door. He related that a female answered the door, that he explained that they had a warrant for the arrest of some individuals, and that he asked for her identification. He said that she informed him her name was Alice Ashmore, and he again asked her for identification. He testified that she then said, "Come in, I'll get it out of my purse." He said that he went in, along with Detective Chapmond; that the female went to her purse, got her identification, and gave it to him; that he ran it through ACIC and NCIC; and that it showed there was an outstanding warrant for her

through another agency. He stated that he asked her if there was anyone else in the house, and she said there was not.

On cross-examination, he explained that there was a total of five or six officers who approached the house, that all were armed, and that only he was in uniform. He denied hearing a dog barking. He could not recall whether Ashmore was arrested or not. He explained that when he first entered the residence, he watched Ashmore go and get her identification. He said that he did not see any contraband in the room, but that he was not looking. He acknowledged that no one ever told Ashmore that she had the right to refuse entry to the officers. He said that he believed the other officers entered the rooms off the living room, that noises were heard, and that one of the officers said he observed what he thought were the makings of a meth lab. Story said that the officers reported hearing a noise and could not see into the rooms, so he assumed the doors off the living room were closed. On re-direct, Story stated that he did not enter the house to search and that he did not ask for consent to search. On re-cross, he stated that he entered the house because Ashmore invited him in as she was getting her identification and that the purpose of asking for her identification was to find out if she was who she said she was and whether she was related to the individuals for whom they were looking. He acknowledged that they were looking for evidence of her identity, but stated that he did not consider going into the house as looking for evidence.

Detective Chris Chapmond of the Hot Springs Police Department testified that he and Story and at least one other officer went onto the porch of the residence located at 247 Glade Street; that a couple of other officers went around to the side of the house; that Story made contact with a female, identified himself, and explained to her that they were looking for an individual wanted for questioning regarding a burglary or burglaries in Arkadelphia; and that she gave them a name and invited them inside to get her identification. He stated that Story stepped in and went to the right, where the woman's purse was on the couch. Chapmond said that he looked toward the kitchen and saw what he believed to be bottled acid, iodine salt crystals, and a gas generator (hydrogen peroxide). He also stated that there was a strong odor in the room. He stated that he recognized the odor from his experience working with narcotics. He testified that he and Detective Stringer heard some sounds in the back bedroom; that they asked if anyone

else was in the house; that the female, Ms. Ashmore, said no; and that for officer's safety, they checked both the bedroom and the bathroom. He stated that they found a Mrs. Cotten in the bathtub; that she also had outstanding warrants for her arrest; that there was an active meth lab in the back corner of the bedroom; that the house was secured; that the drug task force was notified; and that Rick Norris secured a search warrant for the premises. He stated that he then left with the Arkadelphia officers.

On cross-examination, Chapmond testified that he did not recall hearing a dog barking; that there could have been a dog, but that he did not recall one; and that if there were a dog, he would have had him secured for officer's safety. He acknowledged that he did not hear Story advise Ms. Ashmore that she had the right to refuse entry to the officers. He said that on the table in the kitchen, there was camp fuel, Liquid Fire, which is a drain cleaner, and some iodine salt crystals. He testified that he also saw a bottle of hydrogen peroxide, and that those items, plus the smell, led him to believe that they were being used to produce methamphetamine. He stated that there were six officers inside the house prior to the time that they searched the back of the residence. He said that he, Story, Stringer, and three Arkadelphia police officers went into the living room because Ms. Ashmore told Story to come in and that she would get her identification. He acknowledged that it did not take six people to see an identification.

Sergeant Rick Norris of the Hot Springs Police Department testified that he was assigned to the 18th District Drug Task Force as coordinator. He said that on September 9, 2004, he was called to the house at 247 Glade Street in Hot Springs by other officers. He stated that he went to the house, that he looked in through the front door and saw several items, that they secured the residence, and that he went back to get a search warrant. On cross, Norris stated that he based his affidavit on information that he received from the officers who had gone inside the house; if it had not been for their entry, his attention would not have been drawn to that house on that particular day.

For the defense, Allison Ashmore testified that she was at 247 Glade Street on September 9, 2004; that she was asleep on the couch and her dog started barking; and that she got up and heard the police knocking on the door. She said that she went to the door and that they told her they were the police. She stated that she opened the door about a hand length; that the officers told her they

were looking for a girl with purple hair; that they told her to put the dog up before she opened the door; that she put the dog in the bedroom; that she opened the door about eight inches wide and saw two officers; that one officer was in uniform and she talked with him; that she told him there was no girl with purple hair there; and that they did not mention anything about burglary suspects or tell her that they had a warrant for anyone. She stated that her hair was blonde with brown roots.

Ms. Ashmore testified that the officers asked if they could come in and look around to see if she was telling the truth. She said that she told them it was not her house, that she had only been staying there for a couple of days, and that she was eight months pregnant. She testified that she told them they could look right there in the living room and kitchen. She stated that they did not tell her she had the right to refuse to let them in the house and that they did not ask her to sign a consent-to-search form. She stated that when they came in, the officer in uniform stood there talking to her while at least three more officers came in behind him and proceeded to go into the kitchen. She said that she told them not to do that but they did anyway. She explained that there were two other rooms and a closet in the house and that all the doors to those rooms were closed; that she had put the dog in the bedroom; that they asked her if anyone else was there and she told them no because she did not know that her mother had come home; that they started yelling, "somebody's in here," and slung the bathroom door open with their guns drawn; that her mother was in the bathroom taking a bath; that they let her mother get dressed and had her mother put the dog out; that they then proceeded to go through the rest of the house; that they did not have a search warrant at that time; and that they were opening cabinets and drawers. She stated that they told her to pack a bag; that they "sent her down the road"; and that they took her mother to jail. Ms. Ashmore stated that she was not arrested or issued a citation.

The trial court took the matter under advisement, and in a letter opinion dated April 18, 2005, denied appellant's motion to suppress, specifically finding "that the officer's entry into the residence was by spontaneous invitation and not in response to request for consent, so that the provisions of *State vs. Brown* do not apply." Appellant was then subsequently tried by a jury and found guilty. In this appeal, he challenges the trial court's denial of his motion to suppress.

## Standard of Review

In reviewing a trial court's denial of a motion to suppress evidence, we conduct a *de novo* review based on the totality of the circumstances, reviewing findings of historical fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Swan v. State*, 94 Ark. App. 115, 226 S.W.3d 6 (2006). We defer to the credibility determinations made by the trial judge when weighing and resolving facts and circumstances. *Id.*

Stated another way, our standard of review for a trial court's action granting or denying motions to suppress evidence obtained by a warrantless search requires that we make an independent determination based upon the totality of the circumstances, giving respectful consideration to the findings of the trial judge. *Breshears v. State*, 94 Ark. App. 192, 228 S.W.3d 508 (2006). We give considerable weight to the findings of the trial judge in the resolution of evidentiary conflicts and defer to the superior position of the trial judge to pass upon the credibility of witnesses. *Id.* Illegal entry by law enforcement officers into the homes of citizens is the "chief evil" the Fourth Amendment is intended to protect against and therefore is of the highest degree of seriousness. *Id.* It is settled law in this state that warrantless entry into a private residence is presumptively unreasonable under the Fourth Amendment. *Id.* Nonetheless, that presumption may be overcome if the police officer obtained consent to conduct a warrantless search. *Id.* As the United States Supreme Court has explained, a firm line has been drawn by the Fourth Amendment at the entrance to the house. *Id.* (Citing *Payton v. New York*, 445 U.S. 573 (1980)).

## State v. Brown

In *State v. Brown*, 356 Ark. 460, 474, 156 S.W.3d 722, 732 (2004), which involved a "knock and talk" situation, our supreme court held:

> We hold that the failure of the Drug Task Force agents in this case to advise Jaye Brown that she had the right to refuse consent to the search violated her right and the right of Michael Williams against warrantless intrusions into the home, as guaranteed by Article 2, § 15, of the Arkansas Constitution. We affirm the suppression of all evidence seized in this case that flowed from this unconstitutional search. While we do not hold that the Arkansas

Constitution requires execution of a written consent form which contains a statement that the home dweller has the right to refuse consent, this undoubtedly would be the better practice for law enforcement to follow.

Following the supreme court's decision in *Brown*, Rule 11.1(c) of the Arkansas Rules of Criminal Procedure was amended to provide:

> (c) A search of a dwelling based on consent shall *not* be valid under this rule *unless the person giving the consent was advised of the right to refuse consent.* For purposes of this subsection, a "dwelling" means a building or other structure where any person lives or which is customarily used for overnight accommodation of persons. Each unit of a structure divided into separately occupied units is itself a dwelling.

(Emphasis added.) In *Stone v. State*, 348 Ark. App. 661, 669, 74 S.W.3d 591, 595-96 (2002), our supreme court explained:

> A warrantless entry into a private home is presumptively unreasonable under the Fourth Amendment. However, the presumption of unreasonableness may be overcome if the law-enforcement officer obtained the consent of the homeowner to conduct a warrantless search.

(Citations omitted.) Arkansas Rule of Criminal Procedure 10.1 (2005), defines search as

> any intrusion other than an arrest, by an officer . . . upon an individual's person, property, or privacy, for the purpose of seizing individuals or things or obtaining information by inspection or surveillance, if such intrusion, in the absence of legal authority or sufficient consent, would be a civil wrong, criminal offense, or violation of the individual's rights under the Constitution of the United States or this state.

Further, a search occurs whenever something not previously in plain view becomes exposed to an investigating officer. *McDonald v. State*, 354 Ark. 216, 119 S.W.3d 41 (2003).

Here, the basis relied upon by the trial court in denying appellant's motion to suppress was its specific finding that the officer's entry into the home was by "spontaneous invitation" and not in response to a request for consent. Our difficulty has been in

understanding how Ms. Ashmore's "spontaneous invitation" takes this case out of the purview of *Brown, supra*. After *Brown*, a search of a dwelling — even one based upon consent — is not valid "unless the person giving the consent was advised of the right to refuse consent." The officers were very candid in acknowledging that they did *not* advise Ms. Ashmore of the right to refuse consent.

The State has the burden of proof in suppression cases because all warrantless searches are unreasonable unless shown to be within one of the exceptions to the rule that a search must rest upon a valid warrant, and the burden of proof is on those who seek to justify it. *Mays v. State*, 76 Ark. App. 169, 61 S.W.3d 919 (2001). From the evidence presented, the officers were not at the residence to search for drugs, rather they were there either searching for persons, *i.e.*, the persons for whom they had arrest warrants, or, at least, they were there searching for evidence of Ms. Ashmore's identity. In fact, Story explained, "We were looking for evidence of her identity, but I wouldn't consider that going into the house looking for evidence." The candid testimony presented by the State in the instant suppression hearing established that the officers were at the residence to determine if the persons on whom they wanted to serve arrest warrants were actually at the residence. Accordingly, we have determined that the situation falls in the category of a "knock and talk" because the officers were "searching" for individuals for whom they had arrest warrants. They were not sure that those persons were actually located at 247 Glade Street. Therefore, they approached the address to "knock and talk" their way to finding the persons for whom they had arrest warrants.

As quoted previously from the *Bulloch* case, Rule 10.1 of the Arkansas Rules of Criminal Procedure explains that a "search" is

> any intrusion *other than an arrest*, by an officer . . . upon an individual's person, property, or privacy, for the purpose of seizing individuals or things or obtaining information by inspection or surveillance, if such intrusion, in the absence of legal authority or *sufficient consent*, would be a civil wrong, criminal offense, or violation of the individuals' rights under the Constitution of the United States or this state.

(Emphasis added.) Because we have concluded that the facts of this case fit more in the category of a "search" than in the straight service

of arrest warrants, the only "sufficient consent" would have been consent *preceded* by advice of the *right to refuse* consent, as explained in *Brown, supra,* and as stated in Arkansas Rule of Criminal Procedure 11.1, which was *not* done here. A search by any other name is still a search, and this search of the dwelling should have been preceded by advising Ms. Ashmore that she did not have to give consent. Consequently, we hold that the trial court erred in denying appellant's motion to suppress. We reverse and remand this case for proceedings that are consistent with this opinion.

Reversed and remanded.

HART and ROAF, JJ., agree.

VAUGHT, J., concurs.

BIRD and CRABTREE, JJ., dissent.

LARRY D. VAUGHT, Judge, concurring. In this case, the majority advocates reversal based on our supreme court's holding in *Brown v. State,* which mandates that an officer inform a suspect of his right to refuse consent when executing a "knock and talk." 356 Ark. 460, 156 S.W.3d 722 (2004). The majority's analysis rests on a conclusion that "the situation falls into the category of a 'knock and talk' case because the officers were 'searching' for individuals for whom they had arrest warrants." However, I am not convinced that the facts support such a definitive conclusion. Indeed, based on my reading of *Carson v. State,* 363 Ark. 158, 211 S.W.3d 527 (2005), which was not mentioned in the majority opinion, it is apparent that the applicability of *Brown* in cases involving "spontaneous" invitation requires close factual analysis.

In *Carson,* our supreme court considered a scenario where a lone, plain-clothed officer approached the home of David Carson in order to execute a "knock and talk" after receiving a tip that Carson had just purchased "strong iodine tincture, an item used in the manufacture of methamphetamine." *Id.* at 162, 211 S.W.3d. at 529. Once at the suspect's home, the officer went to the door and knocked. When Carson came to the door, the officer displayed his badge and asked if he could "step inside to speak." Carson claimed to be too busy to let the officer in, but agreed to visit on the front porch. The officer testified that he found it strange that Carson had time to visit on the porch but not inside his residence. The officer also noticed that Carson was sweating, had trouble making eye contact, and was shaking. The officer then pointed out his suspi-

cions to Carson — commenting on Carson's erratic behavior, the recent iodine purchase, the strong chemical odor in the air, and the stains on Carson's hands. Eventually, Carson broke down, began to cry, and admitted that he did have a lab inside and would show the officer where everything was. The officer, accepting Carson's invitation, entered the home and observed several items in plain view, which were sufficiently suspicious to support a search warrant.

In a four-to-three decision, our supreme court reversed the trial court's denial of Carson's motion to suppress. The court reiterated the "bright-line rule" it declared in *Brown*, stating "when an officer does not inform a suspect of his or her right to refuse consent, any subsequent search — even one based on the suspect's apparent consent — is invalid." *Id.* at 164, 211 S.W.3d. at 530. Although *Carson* could broadly be categorized as a spontaneous-consent case, in my view, it does not completely resolve the question presented on appeal. My paramount concern is the fact that, unlike the situation presented in *Carson*, officers here did not first execute a "knock and talk" where entry was denied before finally gaining "voluntary consent" to enter the home. Indeed, Ms. Ashmore invited officer Story to enter her home in response to his innocuous inquiry for proof of Ashmore's identity. Further, unlike the situation presented in *Carson*, the record does not clearly establish that Ms. Ashmore was a "suspect" or that she was the target of the officer's interest whatsoever.

However, this is not to say that I disagree with the majority's conclusion. Here we have numerous armed officers surrounding a residence and one officer knocking on the door. Therefore, at the very least there was a "knock," and it does not take an enormous legal leap to conclude that the officer's request for identification was the "talk," thereby triggering the need for a disclaimer prior to the officers' entry into the home. However, based on the prevailing case law, it is a leap nonetheless, that has not been specifically addressed by our supreme court. If there is to be a bright-line rule that *before* an officer enters an individual's home, regardless of how or why he enters, I believe it is for the supreme court to so state. Therefore, I write separately.

As I see it, this case presents two distinct paths for our court to travel, both with particular problems. The problems with the majority's course I have already stated. However, I do not believe that a conclusion that this was not a "knock and talk" because Ms. Ashmore issued an invitation for officers to enter after they

"knocked" but *before* they requested permission is a satisfactory resolution. This is because such a course would also require us to thread a needle of legitimacy that seems innately counter to our state's decision to embrace "a heightened privacy protection for citizens in their homes against unreasonable searches and seizures, as evidenced by our constitution, state statutes, common law, and criminal rules." *Brown,* 356 Ark. at 470, 156 S.W.3d at 729.

Indeed, to affirm under this theory we must also conclude that Ms. Ashmore's invitation to enter — after Story (the sole, uniformed officer) requested to see her identification — extended to both officers Chapmond and Story. In order to do so, we would have to ignore the following testimony of officer Chapmond:

> A: Once she opened the door for Lieutenant Story, they identified each other.
>
> Q: First, how wide did she open the door when she first opened the door?
>
> A: I was to the side, but I do know that they were able to see each other.
>
> Q: Okay.
>
> A: Once they identified each other, she stated her name was Ms. Ashmore. Lieutenant Story asked if she had an I.D., she said, "Yes, I do. Come in. I'll go get the I.D." At the point, that's when we entered behind her. Like I said, she invited us in.
>
> . . .
>
> Q: Okay. So, you and Lieutenant Story, and Stringer, and the other three (3) Arkadelphia Police Officers all went into the living room because Ms. Ashmore told Lieutenant Story, "Come in. I'll get my I.D."?
>
> A: That is correct.
>
> Q: Did it take six (6) of you to see her I.D.?
>
> A: No. It did not.

We would also have to ignore Story's testimony that he knocked on the door and Ms. Ashmore opened the door "just enough" so that he "could see her physical appearance and see

her." And that after he made it clear that he was a police officer, he "asked her if she had some identification, and she said yes. She opened the door completely and said, 'Come in, I'll get it out of my purse.' " He described what happened next

> As I entered the living room, she — I was behind her — she moved to her right and I moved to my — behind her, watching her. She was going into her purse to get her identification, so my eyes were focused on what she was doing and I kept — that was my attention.
>
> . . .
>
> I was watching her as to what her actions were. I took her identification and ran it through A.C.I.C./N.C.I.C. and it showed that there was a warrant out. . . . I had her come out — she sat there on the couch for a minute and then we went outside. She made conversation.

Further, and most importantly, the trial court's letter opinion plainly states that "the *officer's* entry into the residence was by spontaneous invitation." (Emphasis added.) To me, the trial court's use of the singular "officer," and not the plural "officers" is important. *See Baird v. State*, 357 Ark. 508, 182 S.W.3d 136 (2004) (requiring deference to the trial court when weighing and resolving facts and circumstances). It seems logical that when officer Story asked Ms. Ashmore to produce her identification and she responded, "Come in, I'll get it out of my purse," she was inviting only officer Story into the home. Officer Chapmond's testimony, officer Story's testimony and, the trial court's letter opinion support this conclusion.

The resolution of this factual discrepancy is important to the ultimate outcome of this case because officer Story, by his own testimony, neither observed contraband in plain view nor participated in the actual search of the house. He retrieved Ms. Ashmore's identification and "did not do anything else in relation to the house." It was officer Chapmond who noticed a strong odor, observed suspicious items in the kitchen, and heard "a noise" in the back of the house that prompted him to enlist as many as six other officers to assist him in a full-blown "safety" search of the home whereby they discovered a naked woman bathing and a methamphetamine lab. To me, six armed officers entering the home — under the authority of Ms. Ashmore's narrow and limited invitation that she extended to officer Story — then fanning out

and searching the residence for their "safety" is quintessential "overbearing police conduct" and is certainly "offensive to the average person." *See Carson,* 363 Ark. at 166, 211 S.W.3d at 532 (Gunter, J., dissenting).

Therefore, I cannot vote to affirm this case. Instead, I return to the oft-repeated rule that a warrantless entry into a private home is per se unreasonable. *Welsh v. Wisconsin,* 466 U.S. 740 (1984). As such, I believe that the "spontaneous invitation" that Ms. Ashmore issued was very limited in scope and purpose and that the officers' warrantless search exceeded the boundaries of both. Rule 11.3 of the Arkansas Rules of Criminal Procedure provides that a "search based on consent shall not exceed, in duration or physical scope, the limits of the consent given." Therefore, I am satisfied by clear and positive evidence that the scope of the consent to search, if any, given by Ms. Ashmore was for officer Story to accompany her to her purse so that she could retrieve her identification. She did not invite the other officers to enter the home or to go beyond the retrieval of the purse. *See Norris v. State,* 338 Ark. 397, 993 S.W.2d 918 (1999) (relying on "scope of search" concept as a basis for reversal).

S AM BIRD, Judge, dissenting. I respectfully disagree with the majority's conclusion that the trial court's denial of appellant's suppression motion must be reversed, and I would affirm the appellant's conviction.

Appellant filed a pre-trial motion to suppress evidence that was discovered at his residence by officers of the Hot Springs and Arkadelphia Police Departments on September 9, 2004. Appellant alleged in his motion that the items seized by the police officers were discovered after the officers entered appellant's residence without consent. After hearing the testimony of three officers who testified on behalf of the State, and two witnesses who testified for the appellant, the trial court specifically found "that the officer's entry into the residence was by spontaneous invitation and not in response to request for consent, so that the provisions of *State v. Brown* do not apply." I agree with the trial court that *State v. Brown,* 356 Ark. 460, 156 S.W.3d 722 (2004), does not apply.

In *Brown* drug-task-force agents knocked on the door of the residence, Brown answered the door, an agent told her that their purpose was to investigate information about illegal drug activity at the residence, she was asked to sign a consent-to-search form, and she signed it. The agents then entered Brown's residence

where they discovered evidence of methamphetamine use and evidence of precursors used to manufacture methamphetamine. The discovery of these items lead to the issuance of a search warrant and, eventually, to the discovery of evidence of the manufacture and use of methamphetamine and marijuana. The supreme court held that the drug-task-force agents' initial search of Brown's residence was illegal because Brown had not been informed by the officers that she had the right to refuse to give her consent to the search. The supreme court said, "It is the intimidation effect of multiple police officers appearing on a home dweller's doorstep, sometimes in uniform and armed, *and requesting consent to search without advising the home dweller of his or her right to refuse consent* that presents the constitutional problem." *Brown*, 356 Ark. at 466, 156 S.W.3d at 726 (emphasis added).

In the present case Lt. Allen Story testified at the suppression hearing that he was a Hot Springs police officer assisting Arkadelphia officers in serving an arrest warrant on a burglary suspect. Story testified that he went to Burroughs's residence with other officers, that he knocked on the door, and that a female opened it enough that he could see what she looked like. Story testified that he told the female that the officers had a warrant for the arrest of some individuals, that the female identified herself as Alice Ashmore, and that he asked her for identification. Story testified that Ashmore then stated, "Come in, I'll get it out of my purse," and that he and another Hot Springs police detective, Chris Chapmond, entered the residence, along with other officers. On cross-examination, Story said that the words Ashmore used were, "Come in, I'll get my I.D."

Detective Chapmond's testimony was substantially the same as Lt. Story's, reiterating that when Story asked Ashmore if she had any identification, she responded with an invitation for them to "come in and she would get the I.D." Chapmond also recounted that he, Story, a Detective Stringer, and three Arkadelphia officers entered the residence in response to Ashmore's invitation.

Alice Ashmore testified as a witness at the suppression hearing, stating in relevant part that when she opened the door, a uniformed officer told her that they were looking for a girl with purple hair and she responded that there was no girl there with purple hair. She said that the officer asked her if they could come in and look around to see if she was telling the truth, and that she responded that they could look around in the living room and kitchen. Ashmore testified that the officer did not inform her that

she had the right to refuse to let them enter and that they did not ask her to sign a consent-to-search form.

In my view, *Brown* stands for the proposition that when a police officer requests consent to enter a residence, that request must be accompanied by the officer's notice that the request for consent to enter may be refused; otherwise the entry is nonconsensual. Nothing in *Brown* precludes an officer from accepting an unsolicited invitation to enter a residence.

Whether the officers' entry into Burroughs's residence was a result of a spontaneous invitation, as testified to by Lt. Story and Det. Chapmond, or in response to a request for consent, as testified to by Ms. Ashmore, was a matter of credibility to be determined by the trial court, which we are not at liberty to disturb on appeal. *See Gonder v. State*, 95 Ark. App. 144, 234 S.W.3d 887 (2006) (rejecting appellant's argument that he and his wife were bullied and that he consented to a search because he was threatened with incarceration and the children's removal from their home). I would hold that the trial court's finding of a spontaneous invitation takes this case outside the purview of *Brown*. Unlike in *Brown*, where officers went to the residence with the purpose of investigating illegal drug activity, the search in the present case evolved after officers had accepted an invitation from Ashmore to enter appellant's residence.

The majority's difficulty in understanding how Ashmore's invitation to the officers distinguishes this case from *Brown* arises from a misreading of *Brown*. *Brown* does not require that notice of the right to refuse consent be given unless the officers request consent to search. It is illogical to require an officer to inform a person of the right to refuse consent to enter a residence when no such consent has been requested by the officer. I read nothing, either in *Brown* or in Rule 10.1 of the Arkansas Rules of Criminal Procedure, that prohibits an officer from accepting an invitation to enter a residence when the officer has made no request to enter.

I certainly agree with the concurring judge that the majority's position is a "leap" from our supreme court's decision in *Brown*. I do not agree with the concurring judge that the issue presented by this case can be resolved based on the trial judge's placement of an apostrophe in the word "officers" in his letter opinion. From my reading of the testimony, it is clear that while Lt. Story was apparently the only uniformed officer on the scene and that Lt. Story was the one who knocked on the door of

Burroughs's residence, it is equally as clear that Detective Chapmond accompanied Story at the door. It is obvious from Ms. Ashmore's testimony alone that she was aware of the presence of more than one officer outside the door:

> I went to the door and *they* said *they* were the police. I opened the door about a hand length and *they* told me *they* were looking for a girl with purple hair. *They* told me to put up the dog before I opened the door.

> . . . .

> I opened the door about eight inches wide, and could see *two officers.* There was one in uniform, and I talked with him. I told *them* there was no girl with purple hair there. *They* did not mention anything about burglary suspects or tell me *they* had a warrant for anyone.

> . . . .

> They asked if *they* could come in and look around. . . . I told *them they* could look right there in the living room and kitchen.

(Emphasis added.)

From these limited excerpts from Ms. Ashmore's testimony, it is obvious that she knew that Lt. Story was not the only law enforcement at the door and that she invited *them* into the house to look in the living room and kitchen. Considering that this testimony clearly establishes that two police officers were in Ashmore's view outside the door, and considering that Ms. Ashmore obviously considered that she was speaking to both of them, it is hard for me to imagine that the trial court, by its use of the singular possessive "officer's" in describing who was spontaneously invited by Ashmore to enter Burroughs's residence, intended to say that the invitation was extended only to Story but not to Chapmond. With all due respect to the trial judge, I cannot agree that this case should be decided on the strength of his understanding of the significance of the location of an apostrophe.

Deferring to the trial judge to resolve conflicts in testimony, I would conclude that Ashmore spontaneously invited the officers inside the house in response to a request that she produce identification. Because the officers did not request Ashmore's consent to

enter the residence, they were not required to inform her that she had a right to refuse to consent when she invited them in. Therefore, I would uphold the trial court's denial of Burroughs's motion to suppress the evidence that was discovered as a result of police entry into the home.

I am authorized to say that Judge Crabtree joins with me in this dissent.