# SUPREME COURT OF ARKANSAS

No. CR–13–488

| | | |
|---|---|---|
| | | **Opinion Delivered** January 16, 2014 |
| RAYMOND WILSON | APPELLANT | APPEAL FROM THE MISSISSIPPI COUNTY CIRCUIT COURT, CHICKASAWBA DISTRICT [NO. CR–2011-294] |
| V. | | HONORABLE CINDY THYER, JUDGE |
| STATE OF ARKANSAS | APPELLEE | AFFIRMED; ARKANSAS COURT OF APPEALS OPINION VACATED. |

**JOSEPHINE LINKER HART, Associate Justice**

The circuit court denied Raymond Wilson's motion to suppress evidence seized during a traffic stop of the rental car that he was driving. Wilson entered a conditional guilty plea, in accordance with Arkansas Rule of Criminal Procedure 24.3, to trafficking a controlled substance—cocaine. He was sentenced to 120 months' imprisonment in the Arkansas Department of Correction followed by 120 months' suspended imposition of sentence. The Arkansas Court of Appeals affirmed the circuit court's decision. *Wilson v. State*, 2013 Ark. App. 337. Wilson filed with this court a petition for review, which we granted. When we grant a petition for review, we treat the appeal as if it had been originally filed in this court. *Jackson v. State*, 2013 Ark. 201, ___ S.W.3d ____. Wilson argues that the circuit court erred in failing to suppress evidence that was seized in violation of article 2, section 15 of the Arkansas Constitution, the Fourth and Fourteenth Amendments to the United States

Constitution, and Arkansas Rule of Criminal Procedure 3.1.

The following facts were developed at a hearing on Wilson's motion to suppress. A Missouri law enforcement officer, Mark McClendon, placed a global-positioning-satellite (GPS) tracking device on a rental car, a Dodge Charger, while it was parked at or next door to Wilson's home in Malden, Missouri. On the evening of October 2, 2011, Pam Buchanan, a Missouri drug task-force officer, called her distant relative, Officer Blake Bristow of the Jonesboro Police Department. Buchanan stated that her office, through controlled-narcotics buys by confidential informants, had developed information that Wilson was selling crack cocaine in Malden, Missouri. This information indicated that Wilson used rental cars to transport his drugs. Buchanan informed Bristow that they were conducting electronic monitoring on a vehicle being driven by Wilson. She expected that Wilson would be driving the vehicle back from Texas, and it would probably be passing through Jonesboro. Buchanan supplied Bristow with log-in information so that he could access the tracking information from the GPS tracking device on the vehicle. Bristow was tracking the vehicle on October 2, 2011.

Arkansas State Police Trooper Brandon Bennett was on patrol when he received a call from Bristow. Bristow advised him that a vehicle possibly carrying "a load of dope" was on Interstate 40 coming from the Fort Worth, Texas, area and that the vehicle was believed to be headed to Jonesboro. Bristow gave Bennett a description of the vehicle and a tag number, and Bristow continued to update Bennett about the location of the vehicle. Bristow advised Bennett that Wilson did not turn toward Jonesboro off of Interstate 40 but had instead gone

through West Memphis and was on Interstate 55 in Mississippi County, Arkansas. Bristow instructed Bennett to look for the vehicle.

Bennett was stationed in the median of Interstate 55 when he first observed the vehicle. He followed and stopped the vehicle after observing the car traveling seventy-four miles per hour in a seventy-mile-per-hour speed zone and crossing the fog line. Bennett approached the driver of the vehicle, Wilson, asked for his driver's license and insurance information, and inquired about his itinerary. Wilson told Bennett that he was traveling from the Fort Worth area after being there for one day to help a friend move and was heading back to Malden, Missouri, where he lived. Bennett concluded that, given the distances traveled, this explanation did not "add up." According to Bennett, Wilson appeared nervous and would not make eye contact. Bennett asked Wilson for the vehicle's rental agreement. Wilson provided more than one contract, and Bennett noted that Wilson's name did not appear as an authorized driver on any of the agreements. Wilson told him that his girlfriend had "signed off on the rental agreement."

While waiting for information after calling in Wilson's license, Bennett asked for and received Wilson's consent to search the vehicle. Bennett searched for approximately fifteen minutes but did not find any contraband. He testified, however, that he did find "different spots" where the vehicle's carpet had been "purposely" pulled up. This seemed unusual to him because the vehicle was a "fairly new vehicle." Shortly after he completed his search of the vehicle, Bennett learned that Wilson had a prior drug-related arrest.

Prior to the stop, Bennett had tried to find a drug dog, and he contacted the

Blytheville Police Department and spoke with off-duty police officer Steu Sigmon, who agreed to assist, but stated that he would have to drive to Blytheville, pick up his police car, load up the dog, and then drive to his location. After Bennett unsuccessfully tried to find an on-duty officer, he again called Sigmon. According to Bennett, when Sigmon arrived, he "deployed" the dog, and the dog alerted on the rear of the rented vehicle. A videotape of the stop from Bennett's patrol car showed that Bennett pulled Wilson over at 9:03 p.m. Bennett's unsuccessful search of the vehicle concluded at 9:20 p.m. The drug dog arrived at 9:43 p.m. The search with the canine resulted in the discovery of cocaine underneath speakers after the back seat had been pulled down. The cocaine was discovered at 9:59 p.m.

Marcus McKinney, the regional manager for Enterprise Rental Car, also testified at the suppression hearing, and he identified the vehicle Wilson was driving on the date of the arrest as a rental from Enterprise that was rented by Billie Williams. McKinney testified that the rental agreement specified that Williams was the only authorized driver. Among the agreements was one for the period of September 20–27, 2011. According to McKinney, the contract "must have been extended," because the car was not returned until October 3, 2011.

Also at the hearing, Billie Williams testified that on September 20, 2011, she rented the vehicle to accommodate Wilson, who was the father of her eight-year-old child. After renting the vehicle, she immediately turned it over to Wilson so that he could provide transportation and care for their child while Williams was at work. According to Williams, she rented the car for Wilson because a debit card or credit card was required, and Wilson did not have one. Wilson was unemployed at the time and did not own a vehicle. Nonetheless,

he agreed to, and did, reimburse her for renting the car.

McClendon, the officer who placed the GPS tracking device on the vehicle, testified at the hearing that it was his decision to place a GPS tracking device on the rental car that Wilson was using without first obtaining a search warrant. According to McClendon, he was guided by a "good rule of thumb" that he could attach the device on a vehicle as long as he did not invade the curtilage. He testified that, at approximately 4:30 a.m. on September 22, 2011, he placed the battery-powered device on the undercarriage of the vehicle while it was parked in the side yard of 601 Gertie in Malden, Missouri. It was his understanding that Wilson resided at 603 Gertie.

McClendon stated that he was familiar with the United States Supreme Court case of *United States v. Jones*, ___ U.S. ___ , 132 S. Ct. 945 (2012), holding that the government's placement of a GPS tracking device on a vehicle constituted a search, and he conceded that it affected how law enforcement agencies utilized GPS devices. He noted, however, that he installed the device well before the Court handed down *Jones*. McClendon asserted that he did not invade what he understood to be the curtilage of Wilson's residence. He described the location of the vehicle to be on a "path . . . where cars had been on and off." McClendon stated that he understood curtilage to mean "the immediate area around the house—right up against the house."

Wilson testified in his own defense and confirmed that he lived at 603 Gertie but denied that he or anyone else had ever parked the Charger at 601 Gertie. He claimed that while he was living at 603 Gertie, he parked the car at his home next to the porch area in the

driveway.

In support of his motion to suppress the cocaine, Wilson argued that placing a GPS tracking device on the vehicle without a warrant and gathering data about the vehicle's movements was an unconstitutional search and that the evidence seized pursuant to the search should be suppressed. Wilson further challenged the detention following a consensual but unproductive search by Bennett. After arguments of counsel, the circuit court denied Wilson's motion to suppress.

In its written ruling, the circuit court found that Wilson was the driver of a rental car that had been rented for him by Williams. The court noted that, while it was undisputed that Wilson reimbursed Williams for rental of the vehicle, Wilson was never designated as an authorized additional driver as Wilson had not rented the vehicle in his name and Williams did not pay the $10 authorized-driver fee for Wilson to drive the vehicle. Thus, Williams was prohibited from granting permission for others to drive the vehicle, which "defeats the ability of [Wilson] to claim he had a legitimate expectation of privacy in the vehicle." Nonetheless, the circuit court concluded that "if Ms. Williams had authority to grant permission under the contract with Enterprise, she indeed granted permission to [Wilson]."

The court further found that the length of Wilson's detention after the initial stop was not unreasonable in light of the totality of the circumstances. Also, the court found credible McClendon's testimony that the vehicle was located at 601 Gertie, the residence next door to Wilson's, when he placed the GPS tracking device on the vehicle. Although the court acknowledged the United States Supreme Court's decision in *Jones*, it concluded that the

6

officers involved had reasonably relied on then existing precedent, that the good-faith exception applied, and that the evidence collected through the use of the GPS tracking device was not subject to the exclusionary rule. Following the court's ruling, Wilson entered a conditional guilty plea, and he now brings this appeal, arguing that the circuit court erred in failing to exclude evidence that was seized in violation of article 2, section 15 of the Arkansas Constitution, the Fourth and Fourteenth Amendments to the United States Constitution, and Rule 3.1. of the Arkansas Rules of Criminal Procedure.

On review of a circuit court's denial of a motion to suppress evidence, we conduct an independent inquiry based on the totality of the circumstances, evaluating findings of historical facts for clear error. *Villanueva v. State*, 2013 Ark. 70, ___ S.W.3d ____. We give due weight to inferences drawn by the circuit court, and we will reverse the circuit court only if the ruling is clearly against the preponderance of the evidence. *Id.* We also defer to the circuit court's superior position to judge the credibility of witnesses. *Id.*

We first consider whether Wilson has standing to challenge the search of the rented vehicle and the seizure of the cocaine. Wilson asserts that he has standing to contest the placement of the GPS tracking device on the car because Williams gave him permission to use the vehicle. While conceding that "the contract prohibited other drivers than Ms. Williams," he argues that the contract between Williams and Enterprise did not control his constitutionally granted rights under the Fourth Amendment.[1]

---

[1]He analogizes the case before us to situations in which a user of an automobile is held to be covered by the insured's policy even when the user exceeds the scope of the permitted use, citing *Commercial Union Ins. Co. v. Johnson*, 294 Ark. 444, 745 S.W.2d 589 (1988). Likewise, he finds analogous *Liberty Mutual Insurance Co. v. Thomas*, 58 Ark. App. 289, 951

In *Jones*, the United States Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements constitutes a 'search.'" ___ U.S. at ___, 132 S. Ct. at 949. *Jones*, however, did not turn on the issue of standing. In *Jones*, even though the vehicle was registered in Jones's wife's name, the government did not challenge Jones's assertion that he was the exclusive driver. *Jones*, ___ U.S. at ___,132 S. Ct. at 949 n.2.

Before a defendant can challenge a search on Fourth Amendment grounds, he must have standing, and it is the defendant's burden of proving not only that the search of the car he drove was illegal, but also that he had a legitimate expectation of privacy in the vehicle. *Littlepage v. State*, 314 Ark. 361, 863 S.W.2d 276 (1993). The test for standing to assert one's Fourth Amendment rights requires that the driver at least show that he gained possession from the owner or someone with authority to grant possession. *State v. Barter*, 310 Ark. 94, 833 S.W.2d 372 (1992).

In *Barter*, the defendant was stopped while driving a rental car contracted to another person. When the defendant failed to show that he lawfully possessed the car, this court held that he failed to establish a legitimate expectation of privacy in the car searched by the police. Similarly, in *Fernandez v. State*, 303 Ark. 230, 795 S.W.2d 52 (1990), we held that the defendant failed to show that he had a legitimate expectation of privacy in a car when he

---

S.W.2d 564 (1997), where the Arkansas Court of Appeals held that a car lessor's contract that prohibited violation of the law while driving the vehicle did not cancel the lessor's liability insurance when the lessee had a drunk-driving accident. We do not find these cases controlling, however, as they addressed only whether, as a matter of public policy, legally mandated liability-insurance coverage could be avoided by contractual terms.

could not show that either he or his passenger owned or lawfully possessed the car in which the search was conducted. In *Littlepage*, the defendant failed to establish that he had a legitimate expectation of privacy in the search automobile and lacked standing, as he was driving a car that was rented to a third party who was not present at the time of the arrest and who was the only authorized driver in the rental agreement.

In this case, the renter of record, Williams, testified that she had rented the car for Wilson, and while the original agreement had expired, Enterprise officials testified that it "must have been renewed." At the time of the traffic stop, however, Wilson had in his possession a rental agreement that showed Williams as the only authorized driver of the rental vehicle. Williams's grant of permission to Wilson to use the rental car was not effective because the contract did not allow for other drivers to use the vehicle. Thus, Wilson had no legitimate expectation of privacy in the vehicle and no standing to challenge the search of the rental car. Accordingly, we do not consider Wilson's argument that planting the GPS device was an unreasonable search under *Jones*. Likewise, we do not consider Wilson's attempt to distinguish the case before us from *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419 (2011), as no exception to the exclusionary rule is required.

Wilson nevertheless asserts that a passenger of a vehicle rented in another's name has an independent right to challenge his detention. While Wilson does not assert that the traffic stop was made without probable cause, he argues that he has standing to challenge his continued detention while Bennett waited for the arrival of a drug dog and the subsequent search following Bennett's initial consensual search. He contends that his detention was illegal

9

because he was detained for a lengthy period of time and because his detention was not supported by reasonable suspicion.

We conclude that Wilson has standing to challenge his own detention. In *Stokes v. State*, 375 Ark. 394, 291 S.W.3d 155 (2009), the defendant was a passenger in a car that had been rented in Arizona. Neither the driver nor the defendant was listed as an authorized driver on the rental contract, and the contract specified that the vehicle could not be taken outside of Arizona. The *Stokes* court stated as follows:

> In [*State v.*] *Bowers*, [334 Ark. 447, 976 S.W.2d 379 (1998),] we held that the appellant who was a passenger in a vehicle had standing to contest the search of the vehicle after an illegal stop. None of the parties contested the fact that the initial stop was illegal. We distinguished *Bowers* from *Littlepage* and our other previous cases in that *Bowers* involved an illegal stop, and the search for and seizure of the drugs directly followed the stop. We said that the search on the heels of an illegal stop presents a different issue with respect to occupants of a vehicle. *Id.* (citing *Dixon v. State*, [327 Ark. 105, 937 S.W.2d 642 (1997)]). "Similarly, the occupants of a vehicle have standing to assert their own Fourth Amendment rights, independent of the owner's, such as challenge to the initial stop, or the seizure of their person." *Id.* (quoting *Dixon*).

*Id.* at 400, 291 S.W.3d at 158. Thus, we conclude that Wilson has standing to contest the seizure of his person pursuant to the traffic stop.

In asserting that his continued detention following Bennett's initial search was illegal, Wilson argues that Bennett had already completed the "routine tasks" associated with the traffic stop. In support of his argument, he notes that Bennett testified that if he had intended only to issue a ticket for the traffic violations, the stop would have lasted just twenty minutes. While acknowledging that Bennett testified that his knowledge of Wilson's suspected "drug activities" caused him to doubt Wilson's explanation for traveling to Texas for such a short stay, and that Wilson appeared "nervous," Wilson argues that these factors did not justify

continuing to detain him until the drug dog arrived. Thus, he asserts that his continued detention was unreasonable and violated his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, article 2, section 15 under the Arkansas Constitution, and Arkansas Rule of Criminal Procedure 3.1.

The question squarely presented is whether Bennett could properly detain Wilson after completion of the initial search. Rule 3.1 of the Arkansas Rules of Criminal Procedure permits a law enforcement officer to stop and detain any person who he reasonably suspects is committing a felony if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. Rule 3.1 further provides that an "officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances." During a valid traffic stop, an officer may ask basic questions about a motorist's destination and the purpose of his trip, and may also ask for permission to search the motorist's vehicle. *Yarbrough v. State*, 370 Ark. 31, 257 S.W.3d 50 (2007).

In *Menne v. State*, 2012 Ark. 37, 386 S.W.3d 451, we concluded that reasonable suspicion to justify continued detention existed where: (1) during a routine background check, the officer learned of the defendant's arrest history; (2) one month prior, the defendant's truck had been stopped and the defendant's passenger was arrested for possession of marijuana; (3) the officer had information that the defendant was suspected of drug dealing; (4) the defendant appeared "nervous"; and (5) the traffic stop and detention occurred around

11 p.m. In *United States v. Bloomfield*, 40 F.3d 910 (8th Cir. 1994), the Eighth Circuit concluded that a one-hour wait for a drug dog was not unreasonable because the officer acted diligently in securing the closest available drug dog.

Here, Bennett had been advised that Wilson was involved in the drug trade and trafficked in controlled substances. He noted that when Wilson was initially stopped, he was nervous and would not make eye contact. Wilson was driving a rental car for which he was not an authorized driver. Wilson gave an explanation of his trip to Texas that did not seem rational. During the initial consensual search, Bennett discovered that the carpet in the rental car had been pulled back purposely, which he concluded was odd for a fairly new vehicle. Further, shortly after completing the initial search, Bennett learned that Wilson had a prior drug-related arrest.[2] Given these facts, we hold that, during the initial detention, Bennett developed sufficient information to justify Wilson's continued detention. Furthermore, the canine arrived less than twenty-three minutes after Bennett had concluded his initial search, and Bennett made diligent efforts to secure a drug dog. Under these circumstances, it was reasonable for Bennett to await the arrival of a drug dog so that Bennett could establish the legality of Wilson's conduct, and we hold that this brief delay was reasonable. Accordingly, we conclude that the circuit court properly denied Wilson's motion suppress the evidence and

---

[2]Neither Wilson nor the State addresses whether Wilson revoked his consent to search the vehicle following the initial search. There is no requirement that law enforcement officers advise him that consent may be withheld. *Grant v. State*, 267 Ark. 50, 589 S.W.2d 11 (1979). A search cannot exceed, in duration or physical scope, the limits of the consent given. Ark. R. Crim. P. 11.3 (2013). We note that Wilson could have withdrawn his consent or limited the search. Ark. R. Crim. P. 11.5 (2013). The burden is on the State to prove by clear and positive evidence that consent to a search was freely and voluntarily given. Ark. R. Crim. P. 11.1 (2013).

affirm.

Affirmed.

CORBIN and GOODSON, JJ., concur.

**COURTNEY HUDSON GOODSON, Justice, concurring.** I concur with the majority's decision to affirm this case on the basis that Wilson lacked standing to challenge the search of the rental car and that his continued detention after the initial traffic stop was reasonable. I write separately to emphasize that *United States v. Jones*, 132 S. Ct. 945 (2012), will, in my view, impact this court's Fourth Amendment jurisprudence in the future as well as to underscore the factors supporting the majority's conclusion concerning the reasonableness of Wilson's continued detention after the initial traffic stop.

In *Jones*, the Supreme Court of the United States held that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a "search." As the Court noted, the use of a GPS device can generate incredibly detailed information about a vehicle's location.[1] The Court specifically stated that by placing the GPS device on the respondent's car, the Government physically occupied private property for the purpose of obtaining information. *Jones*, 132 S. Ct. at 949. In the present case, there is no doubt that law enforcement officers physically occupied private property for the purpose of obtaining information by placing a GPS device on Wilson's rental car. To be clear: The majority opinion does not, in contravention of *Jones*, hold that the

---

[1] In this regard, the Court noted that "[b]y means of signals from multiple satellites, the device established the vehicle's location within 50 to 100 feet, and communicated that location by cellular phone to a Government computer. It relayed more than 2,000 pages of data over the 4–week period." *Jones*, 132 S. Ct. at 947.

13

Fourth Amendment permits the attachment of GPS devices to rental cars under any circumstances. Instead, the majority correctly holds that *Jones* does not control in this particular case because of the threshold issue of standing.

As a preliminary matter, an appellant must have standing to assert Fourth Amendment rights because those rights are personal in nature. *State v. Bowers*, 334 Ark. 447, 450, 976 S.W.2d 379, 381 (1998). Whether an appellant has standing depends on whether he manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as reasonable. *Stokes v. State*, 375 Ark. 394, 399, 291 S.W.3d 155, 158 (2009). The Fourth Amendment provides, in relevant part, that the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated. *Jones*, 132 S. Ct. at 949. It is beyond dispute that a vehicle is an effect as that term is used in the Fourth Amendment. *Id*. However, this court has specifically held that the driver of a rental car must show that he gained possession from the owner or someone with authority to grant possession in order to have standing to assert his Fourth Amendment rights. *Littlepage v. State*, 314 Ark. 361, 863 S.W.2d 276 (1993).

The respondent in *Jones* was not the registered owner of the vehicle at issue, his wife was. In reaching its decision, the United States Court of Appeals for the District of Columbia held that the vehicle's registration did not affect Jones's ability to make a Fourth Amendment objection. However, upon review, the Court explicitly stated that it did not consider the Fourth Amendment significance of Jones's status because the Government did not challenge the lower court's determination. The Court indicated that Jones had "at least the property

rights of a bailee." *Jones*, 132 S. Ct. at 949. Contrasting that with the present case, Wilson obtained the rental vehicle from Williams without the knowledge or consent of the owner, Enterprise. Thus, while Wilson may have satisfied the first prong of the standing inquiry, the fact that he gained possession from someone other than the owner diminishes the reasonableness of his expectation of privacy. As a result, Wilson fails to satisfy the second prong.

While Wilson does not have standing to challenge the search of the rental vehicle under these circumstances, the majority correctly holds that, just like any other occupant of a vehicle, Wilson has standing to assert his own Fourth Amendment rights, including a challenge to the initial stop or seizure of his person. *State v. Bowers*, 334 Ark. 447, 450, 976 S.W.2d 379, 381 (1998); *Stokes*, 375 Ark. at 399, 291 S.W.3d at 159. However in this instance, Wilson does not contest the legality of his initial stop. Rather, he does challenge whether Officer Bennett developed a reasonable suspicion sufficient to continue his detention beyond the initial stop and search of the vehicle.

As part of a valid traffic stop, an officer may conduct routine tasks such as making computerized checks of the vehicle's registration and the driver's license and criminal history. If, before the legitimate purpose of the traffic stop has ended, the officer develops a reasonable, articulable suspicion that the person is committing, has committed, or is about to commit a felony, the officer may further detain the person if such action is reasonably necessary to determine the lawfulness of his conduct. *Sims v. State*, 356 Ark. 507, 512–13, 157 S.W.3d 530, 534 (2004) (citing Ark. R. Crim. P. 3.1). A reasonable suspicion requires circumstances

that, while not sufficient to give rise to probable cause, indicate more than a simple hunch or purely conjectural suspicion. *Id*. at 513, 157 S.W.3d at 534 (citing Ark. R. Crim. P. 2.1). The determination of whether an officer has reasonable suspicion is based on an examination of the totality of the circumstances. *Davis v. State*, 351 Ark. 406, 413, 94 S.W.3d 892, 896 (2003). Arkansas Code Annotated section 16–81–203 specifically mentions the demeanor of the suspect, knowledge of the suspect's background and character, time of night, and information received from third parties as factors to be considered by law enforcement officers to determine grounds for reasonable suspicion. Ark. Code Ann. § 16–81–203(1), (3), (6), (9) (Repl.2005). There is no requirement under the statute that a police officer need to have personally observed any or all of these factors. *Menne v. State*, 2012 Ark. 37, 386 S.W.3d 451.

After initiating a valid traffic stop, Bennett asked for permission to search the rental car Wilson was driving, and Wilson gave consent. During the search, Bennett noted that there were various spots in the car where the carpet appeared to have been purposely pulled back. In addition, he was aware that Missouri law enforcement officers were investigating Wilson for drug trafficking and that Wilson was driving a rental car for which he was not an authorized driver and for which the rental contract had expired five days prior. Bennett also testified that Wilson appeared nervous and would not make eye contact. The circuit court correctly concluded that the information known by Bennett constituted reasonable suspicion to detain Wilson following the initial stop.

Under Arkansas Rule of Criminal Procedure 3.1, a detention may last for fifteen minutes or as long as is reasonable under the circumstances. The fifteen-minute time

constraint under Rule 3.1 does not begin to run until after the officer has completed the routine tasks associated with a traffic stop. *Menne*, 2012 Ark. 37, at 7, 386 S.W.3d at 455. The genesis for Rule 3.1 is the holding of *Terry v. Ohio*, 392 U.S. 1 (1968), that a police officer can detain a person without violating the Fourth Amendment if the officer has a reasonable suspicion that criminal activity may be afoot. *Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001). In assessing whether a detention is too long in duration to be justified as an investigative stop, it is appropriate to examine whether police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. *United States v. Sharpe*, 470 U.S. 675, 686 (1985). The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it. *Id*. at 687, 105 S.Ct. 1568. Courts must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (quoting *Sharpe*, 470 U.S. at 685). When police need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times. *Id*.

In reviewing the circumstances in this case, the majority correctly affirms the circuit court's determination that Bennett acted diligently in pursuing a means of investigation that was likely to confirm or dispel his suspicions quickly and that he did not unreasonably detain Wilson while awaiting the arrival of a canine. According to Bennett's testimony, he initiated

the traffic stop of Wilson at 9:03:32 p.m. Bennett testified that he had run Wilson's driver's license, checked ACIC/NCIC, discussed the rental agreement with Wilson, and completed his first search by 9:20:39 p.m., approximately seventeen minutes after the stop was initiated. The canine unit arrived at 9:43 p.m., approximately twenty-three minutes after Bennett had completed the routine tasks associated with the traffic stop.[2] Moreover, Bennett testified that he actually began contacting canine units before stopping Wilson in an effort to have a dog immediately available. Under these circumstances, it cannot be said that a twenty-three-minute detention was unreasonable.

CORBIN, J., joins

*John H. Bradley*, Chief Public Defender, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Kathryn Henry*, Ass't Att'y Gen., for appellee.

---

[2]The fifteen-minute time constraint under Rule 3.1 does not begin running until after the routine tasks associated with a traffic stop are completed. *Menne*, 2012 Ark. 37 at 7–8, 386 S.W.3d at 455. Although the circuit court correctly concluded that Wilson was not unreasonably detained, the circuit court incorrectly calculated the time as a forty-minute detention starting when Bennett initiated the traffic stop.